**In the Interests of A.C., A.C., S.C., S.C., and J.C., Minor Children, Appellants,**

**K.C., Natural Mother, Appellee.**

No. 87–43.

Supreme Court of Iowa.

Nov. 25, 1987.

As Corrected Dec. 3, 1987.

Jane A. Harlan, Newton, for appellants.

Gerald B. Feuerhelm, Des Moines, for appellee natural mother.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., Charles K. Phillips, Asst. Atty. Gen., John Billingsley, Co. Atty., and Clifford D. Wendel, Asst. Co. Atty., for the State.

P. Lewis Pitts, Jr., and Gayle Korotkin, Chapel Hill, N.C., for amicus curiae Christic Institute South.

Considered by HARRIS, P.J., and LARSON, SCHULTZ, LAVORATO, and NEUMAN, JJ.

HARRIS, Presiding Justice.

Five children, ranging in age from three months to ten years, were voluntarily placed under foster care by their mother on March 14, 1985. The placement soon became involuntary and this dispute centers around efforts by the Iowa department of human services to rehabilitate the mother and conflicting efforts by the foster parents to wrest the children from both their mother and the department. The district court, sitting as juvenile court, determined that efforts to help the mother to acquire parenting skills should continue. Hence the juvenile court rejected a petition to terminate the parent-child relationship. The court also rejected claims that custody of the children should remain with the foster parents. We think the parent-child relationship with the mother should be terminated.[1] We agree with the juvenile court's rejection of the other claims.

It is readily apparent why the mother felt driven to voluntarily place the children into foster care and why the department felt compelled to resist her attempts to withdraw the placement. The mother suffers from a bipolar mental illness which causes an antisocial personality. She was hospitalized for this condition in Newton from March 1985 until May 15, 1985. She was then admitted to a group care facility at Ames, where she stayed until August 1986. She was thereafter removed to a halfway house in Cedar Rapids where she remained under counseling at the time of the hearing in juvenile court.

The evidence is overwhelming that, because of the mother's tragic condition, the children were physically neglected and abused. The children were ill-fed and were for the most part compelled to rely on one another for routine care and feeding. A department social worker described the mother's house as it appeared in early 1985:

> The home was in substandard condition. There were windows broken out of the home.

The same witness earlier testified:

> There was no food present in the house for the children particularly the infant child, [J.C.], who is three or four months old at this time. There was dog feces laying around the home which three year old [S.C.] proceeded to track around the whole house while we were there talking about placing the children. It's the worst cockroach situation I have ever seen. They were crawling on the walls in broad daylight which is not real typical, in everything we opened it was just infested with cockroaches. There were dirty dishes and clothing piled up around the house. We couldn't find any clothing to take for any of the five children that day, not even a pair of socks to put on [S.C.] to leave with.

The witness did express the opinion that the mother was not incapable of parenting the children but, when asked whether there was any way to scale her parenting abilities, replied: "On a motivational scale I think she is real high. I don't know how she would place on an abilities scale."

The two eldest children are bitterly hostile to their mother because of the neglect and because of violent physical abuse heaped upon the children by the mother and one of the mother's boyfriends. They related how one of the children's hair was pulled out by the mother. They also described beatings by the mother with a board and with a chain dog leash.

The mother is remorseful over her treatment of the children. She attributes her conduct, which she feels the children exaggerated, to her illness. At the time of her testimony she believed her illness was being controlled by medication and the counseling she was then receiving at the halfway house. She conceded, however, she was not yet well.

---

**1.** None of the children's three fathers are party to this action or appeal.

Professional witnesses, testifying in the mother's behalf, were only cautiously optimistic about the mother's chance of improving. A psychiatrist familiar with the case testified:

A bipolar illness is a cyclical illness. It means that it comes and goes. And a person can go through life and have several cycles or episodes of the disease, and all of a sudden it will go away. It may not reappear again, and it may reappear. It is hard to say. So ... the medication is usually used to abate the cycle that a person is already in. It's possible that she could even go off her medicine and do well for the rest of her life. It's possible that she could go off her medicine and get sick again, or it's possible she could stay on her medicine and do well. It's really hard, because we can't predict the course of the illness. But as long as she maintains contact with somebody—and we know what medications now work because she's been on the medicine, so her prognosis can be good, and she can become functional again.

Q. Do you have any impression as to her potential for being able to care for five children? A. Well, that's a difficult question for me to answer as a psychiatrist. In my last two contacts with her, it's my feeling that there's not—there is no psychiatric reason now why she should not be able to care for her children. I certainly would not want to jump into it immediately. I would like —I think it should be something that is gradually done. But I have a lot of people who are bipolar patients who take their medication and do quite well as mothers and fathers. So long as she maintains herself on the medicine and she appears well and has contact with somebody who can assess how she's doing, I think it's possible.

No psychologist, psychiatrist, or other expert testified that the natural mother would be able to take care of her children in the near future. At best, from the mother's point of view, they merely testified there was no psychological reason she could not.

The department placed the children in the temporary care of Larry and Paula Mick, where they remained for about eighteen months. Not unexpectedly, in view of the children's past environment, a strong bond soon developed between the children and the Micks. The bonding was no accident. We emphatically agree with the juvenile court's conclusion that the Micks resolutely set out to make the temporary placement a permanent one, a charge they and the children deny.

I. Jane A. Harlan, a Newton lawyer who is a second cousin of Larry Mick, was appointed guardian ad litem for the children and in that capacity brought this proceeding under Iowa Code chapter 232 to terminate the relationship between the children and their natural parents.[2] The juvenile court's refusal to terminate the relationship is the first and principal issue in the case.

The juvenile court found that the mother could resume her parental role. It was persuaded by testimony that the natural mother, through medication and counseling, was able to control her mental illness and there was no reason she could not take care of her children.

Iowa Code section 232.116(5) (1985) states that the court may order termination of the parent-child relationship if it finds:

a. The child has been adjudicated a child in need of assistance pursuant to section 232.96; and

b. The custody of the child has been transferred from the child's parents for placement pursuant to section 232.102 for at least twelve of the last eighteen months; and

c. There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102.

---

**2.** Incredibly, the guardian ad litem failed or neglected to secure adequate service of notice on any of the three fathers of the children. This inexcusable failure seems highly likely to further aggravate the children's problems because a final permanent disposition must accommodate the various fathers' rights.

Of these three requirements there is no question here that (a) the children were adjudicated children in need of assistance, and (b) custody of the children was transferred from the natural mother for placement for at least twelve of the last eighteen months.

The provision at issue here is (c). We must examine the record to determine whether there was clear and convincing evidence that the children cannot be returned to the mother's custody.

We explained in *In re T.D.C.*, 336 N.W. 2d 738 (Iowa 1983):

Several previously enunciated principles have served to guide our examination of the record before us. Appellate review of the proceedings to terminate a parent-child relationship is de novo; thus "it is our duty to review the facts as well as the law and adjudicate rights anew on those propositions properly preserved and presented to us." We accord weight to the fact findings of the juvenile court, especially when considering the credibility of the witnesses whom the court heard and observed firsthand, but we are not bound by those findings.

Central to a determination of this nature are the best interests of the child. In this connection we look to the child's long range as well as immediate interest. Hence, we necessarily consider what the future likely holds for the child if returned to his or her parents. Insight for this determination can ·be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care that parent is capable of providing.

*Id.* at 740–41 (quoting *In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981)) (citations omitted).

■ The State has the duty to assure that every child within its borders receives proper care and treatment, and must intercede when parents fail to provide it. *In re Dameron*, 306 N.W.2d at 745. Our current statutory termination provisions are preventative as well as remedial. *Id.* Child custody should be quickly fixed and little disturbed. *In re Kester*, 228 N.W.2d 107, 110 (Iowa 1975). Children should not be made to suffer indefinitely in parentless limbo. *Id.*

In determining whether there is clear and convincing evidence that the children cannot be returned to the care of their mother, we are not to engage in a comparison of the mother's home with the foster home. We have said:

Presumably every foster home will provide good care. The parent's right to have a child returned, however, is not measured by comparing the parent's home to the foster home or an ideal home. Rather the parent's right is established by negating the risk of recurrence of harm.

*In re Blackledge*, 304 N.W.2d 209, 214–15 (Iowa 1981).

There are a number of stern realities faced by a juvenile judge in any case of this kind. Among the most important is the relentless passage of precious time. The crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems. Neither will childhood await the wanderings of judicial process. The child will continue to grow, either in bad or unsettled conditions or in the improved and permanent shelter which ideally, at least, follows the conclusion of a juvenile proceeding.

The law nevertheless demands a full measure of patience with troubled parents who attempt to remedy a lack of parenting skills. In view of this required patience, certain steps are prescribed when termination of the parent-child relationship is undertaken under Iowa Code chapter 232. But, beyond the parameters of chapter 232, patience with parents can soon translate into intolerable hardship for their children.

Our statutory scheme for protecting the rights of natural parents in termination proceedings was carefully crafted as a legislative response to federal court decisions which held our prior parental termination statutes unconstitutional. *See Alsager v. District Court*, 406 F.Supp. 10 (S.D.Iowa 1975), *aff'd*, 545 F.2d 1137 (8th Cir.1976). Although it was incumbent upon our legislature to react to these holdings it would be

wrong for our courts to thereafter overreact to them.

It is unnecessary to take from the children's future any more than is demanded by statute. Stated otherwise, plans which extend the twelve-month period during which parents attempt to become adequate in parenting skills should be viewed with a sense of urgency. Of course some suggested extensions will prove to be appropriate. The judge considering them should however constantly bear in mind that, if the plan fails, all extended time must be subtracted from an already shortened life for the children in a better home.

■ Expert testimony suggested that a continued relationship with the mother could be justified at least in part because the children need to face up to the extreme hostility they feel. According to the testimony, the children must work through and resolve their bitter resentment of their mother. We in no way disparage the view that serious hostile feelings and resentments are matters to be dealt with. We are nevertheless convinced that these children should not for that reason alone be returned to their mother. For the children, the cure would be much worse than the disease. Another way must be found to help them deal with their resentments.

■ In view of the availability of the department's efforts in her behalf, it is not controlling here that the mother has no home, no money, no current skills, no job and no real prospects of acquiring any. What is of controlling importance is her total inability to mother the children. It seems inescapable to us that the mother has no realistic chance to become adequately equipped to care for these children during the years remaining in their childhood. Her mental illness, though cruelly unfair from her point of view, continues a threat to those around her. She has shown she cannot care for herself, much less for five children.

It is past time to terminate her relationship with the children. We order it done.

II. Ms. Harlan was removed as guardian ad litem following the proceedings in juvenile court but, as attorney for the children, assigns error in rulings which she considers adverse to the children's rights to maintain their relationship with the foster parents. We find no error in assignments.

Our review of ordinary custody cases is de novo. *In re Blackledge*, 304 N.W.2d 209, 210 (Iowa 1981). We employ the same scope of review in children-in-need-of-assistance proceedings under section 232.102. *In re J.R.H.*, 358 N.W.2d 311, 317 (Iowa 1984). Of course the Micks' situation as foster parents distinguishes this proceeding from the ordinary custody dispute.

There is a pressing societal need for temporary foster homes. The child victims of abuse are in desperate need of shelter and care. During the time required for courts or officials to process and consider their needs, the children must be nurtured in a safe environment.

It should be apparent that one of the paramount needs of a child living under the stress of such unfortunate circumstances is to be free from direct or indirect proposals by those sheltering them to make the association permanent. To some it may seem innocent, even a good thing, to offer a permanent love to the child under temporary care. But unselfish temporary parents recognize that such a bonding is not kind. On the contrary it tends to be selfish on the part of the adults and is highly likely to be harmful to the child.

Temporary foster relationships must be designed with the knowledge they will almost certainly end in separation. The children often return to their natural parents. Often another solution must be found. Separation from foster parents holds the potential to be a painful experience. Such a separation would become unnecessarily cruel if the foster parents have led the children to believe placement in their home was permanent.

We agree with the juvenile court's conclusion that it was in the best interests of the children to change their placement from the Micks. Parental rights of the mother were very much in issue at the time placement was ordered changed. The three fathers of the children were not yet

subject to the court's jurisdiction. Options for the children's future had to be kept open. It was crucial that the children be under the care of foster parents who could and would refrain from seeking to bond a permanent relationship.

III. We also find no due process violation in moving the children from the Micks' home. It is contended that the children have a constitutionally protected liberty interest in a permanent living situation, a facet of the right to family privacy.

■ In order to make out a claim of deprivation of fourteenth amendment due process rights, a person must show: (1) deprivation of a liberty interest protected by the fourteenth amendment; and (2) the procedure used to deprive that interest was constitutionally deficient. *Board of Regents v. Roth*, 408 U.S. 564, 569–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548, 556–57 (1972). The United States Supreme Court has stated that liberty denotes not merely freedom from bodily restraint but also freedom to marry, to establish a home and to bring up children. *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 1045 (1923).

■ State statutes may create liberty interests which are entitled to due process. *Vitek v. Jones*, 445 U.S. 480, 488, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552, 561–62 (1980). When no right or justifiable expectation is created a state can act without providing due process. *See, e.g., Meachum v. Fano*, 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451, 461 (1976).

In *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), the court declined to decide whether a liberty interest exists in foster family relationships. Other authorities indicate it does not. *See Kyees v. County Dep't of Pub. Welfare*, 600 F.2d 693, 698 (7th Cir. 1979); *Drummond v. Fulton County Dep't of Family and Children's Servs., Inc.*, 563 F.2d 1200, 1207 (5th Cir.1977). *But see Brown v. County of San Joaquin*, 601 F.Supp. 653, 662 (E.D.Cal.1985).

■ Under these authorities the key question becomes whether Iowa law creates the expectation that the foster family relationship will be permitted to continue after the children have resided with foster parents for a certain period of time. Iowa law clearly does not create such an expectation.

As we have tried to make clear, the child in foster placement needs first of all to reach a good permanent placement. Time is of the essence. We have already learned of the harm that results to the children by the agonizing delays in our existing process. It would be decidedly antagonistic to the children's best interests to erect another panoply of due process rights for still another group, to be litigated and appealed before there could be a resolution of the children's plight.

We reject the due process challenge.

IV. The former guardian ad litem contends the removal of the children from the foster home denied them equal protection of the laws. It is argued that statutes and policies applied here deprived the foster children of the right to enter into significant relationships without state interference, a right that would not be denied children who were not involved with foster care.

■ At the threshold of any equal protection claim it is necessary to decide the type of scrutiny to be given the challenged activity. *Mills v. State*, 308 N.W.2d 65, 66 (Iowa 1981). Strict scrutiny is employed only when a fundamental right or suspect class is involved. *Veach v. Iowa Dep't of Transp.*, 374 N.W.2d 248, 249 (Iowa 1985). Suspect classifications are generally based on race, alienage or national origin. *State v. Martin*, 383 N.W.2d 556, 559 (Iowa 1986). Strict scrutiny requires that a compelling interest be served by the discrimination. *Johnson v. Charles City Community Schools Bd. of Educ.*, 368 N.W.2d 74, 84–85 (Iowa), *cert. denied*, 474 U.S. 1033, 106 S.Ct. 594, 88 L.Ed.2d 574 (1985). If the classification does not involve a fundamental right or a suspect class, it is subject to the rational basis test. *Veach*, 374 N.W.2d at 249. Under the ra-

**616**

tional basis test, a class distinction will survive if it rationally furthers a legitimate state interest. *Id.* The nature of the scrutiny to be employed here does not change the outcome. The challenge fails under either test.

The rational basis test is easily passed. Temporary foster homes rationally further the state's legitimate interest in maintaining children in a relationship with their natural parents. Removal from a temporary home does the same thing.

The strict scrutiny test is also passed. As noted, under a strict scrutiny test the first question is whether there is a compelling state interest in the classification. When adults can show they will be good parents to their children the state has a compelling interest in reuniting the children with those parents, even when the children have become attached to foster parents.

The second question under the strict scrutiny test is whether removing children from a foster home which discourages reunification is necessary to achieve the state's interest in preserving the children's relationship with their natural parents. We think the answer is clearly yes.

The equal protection challenge is without merit.

V. The former guardian ad litem urges a number of other assignments, only some of which are appropriate for appellate review. We find no merit in a challenge to a discretionary ruling which rejected a motion to remove the natural mother's attorney from the case. Certain motions were filed after jurisdiction in juvenile court had been lost by the bringing of this appeal. *Hulsing v. Iowa Nat'l Mut. Ins. Co.,* 329 N.W.2d 5, 7 (Iowa 1983). We give them no consideration.

The children's attorney, who was removed as their guardian ad litem, protests the allowance of only $500 of the $5700 she claimed for legal services. The order setting fees was discretionary. *Hulse v. Wifvat,* 306 N.W.2d 707, 709 (Iowa 1981). We find no abuse.

Compensation should be fixed much the same as in criminal cases: for "the time necessarily spent, the nature and extent of the services, ... responsibility assumed and results obtained, the standing and experience of the attorney in the profession, ... the customary charges for similar services" and the certainty of payment from the public treasury. *Hulse,* 306 N.W.2d at 711.

A number of factors support the trial court's exercise of discretion. The quality of the services was poor. We have already noted that jurisdiction was not obtained over the fathers. We have received for filing the disciplinary commission's public reprimand of Ms. Harlan for professional misconduct in these proceedings for making extrajudicial statements. As we have mentioned, she is the second cousin of Mr. Mick, the foster father. She should not be compensated as attorney for the children for any efforts which were expended to further the private wishes or interests of the Micks. We find no abuse in the finding that $500 was the value of that part of her services which were necessarily expended in representing the children.

To detail other contentions would unduly extend this opinion. We order termination of the parental relationship between the children and their natural mother. We remand the case to juvenile court with directions that the department proceed immediately to seek jurisdiction over the natural fathers of the children and, as soon as possible, to obtain a permanent resolution of their placement.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

All justices concur except NEUMAN, J., who dissents.

NEUMAN, Justice (dissenting).

I concur in divisions II through V of the majority opinion, but I respectfully dissent from division I.

By characterizing the juvenile court's action as no more than a protracted effort "to help the mother acquire parenting skills,"

the majority has, in my opinion, minimized the tragedy of this case. What the juvenile court in fact recognized—along with every other expert who testified—was the mother's extraordinary effort to overcome a debilitating mental illness which virtually destroyed her ability to care for herself, let alone five children, until proper diagnosis made recovery a possibility.

Because this mother, through no fault of her own, has not progressed in her recovery at the speed the majority's timetable would suggest, her parental rights are being irrevocably terminated. By choosing this extraordinary remedy, the majority has substituted its judgment for that of *every* expert called to testify, whether by the State or Jane Harlan. All pointed to reunification of the family as not only the most desirable goal, but one that was realistically attainable. All cited the tremendous strides KC has made in achieving that goal. Not one proposed termination of parental rights as being in the best interest of these children.

A year has now passed since this case was heard by the juvenile court. Intervening events may prove the majority's prediction of the mother's incapacities correct. But our task is to affirm or reverse the judgment of the juvenile court based on the evidence before it. Under this record, I would have affirmed the court's dismissal of the termination petition.