In the Interest of C.S., C.P., and D.D., Minor Children, J.D. and P.D., Parents, Appellants.

No. 87–1158.

Court of Appeals of Iowa.

March 23, 1988.

Gene L. Beach of Grimes, Buck, Schoell & Beach, Marshalltown, for appellants (parents).

Thomas J. Miller, Atty. Gen., and Charles K. Phillips, Asst. Atty. Gen., for appellee State.

Kevin O'Hare of Johnson, Sudenga, Carter, Latham & Peglow, Marshalltown, guardian ad litem for the children.

Heard by OXBERGER, C.J., and DONIELSON and SCHLEGEL, JJ., but considered en banc.

SACKETT, Judge.

This case comes to us on appeal from a review hearing in juvenile court. We address the claim of two parents that their children should be moved from a foster home in Marshall County to a foster home in Polk County and that venue of the Child in Need of Assistance petition should be transferred to Polk County. We affirm the trial court's decision to leave the children in the foster home where they are well adjusted and to leave venue in Marshall County.

This case originally involved four children. Two have reached their majority during these proceedings. We are concerned with the physical placement of a girl, C.P., born November 19, 1972, and a boy, D.D., born March 17, 1977. The girl is the natural daughter of the mother. The boy is the natural child of both parents. The children are currently living as foster children in the home of their mother's brother and his wife. The placement in the foster home followed a series of serious problems with the relationship between the four children and the parents, particularly the father. Because of the problems the children were determined to be children in need of assistance and were placed by the court in the uncle's and aunt's care.

Since the placement extensive counseling has taken place. The children have made an excellent adjustment to their uncle's home and are thriving. The counselors recommended the children stay with the uncle. In fact, everyone involved with the situation *except* the parents contends the placement should continue. The parents have moved from Marshall County to Polk County to obtain education. They admittedly are unable to take the children into their home at this time. The main thrust of the parent's argument is that because the children are so secure in the foster home the parents will have difficulty convincing the children to come back. The trial court found:

> [the] parents have been given a considerable amount of time, services and expenses in the opportunity to reunite their family. Progress toward reunification has been minimal if any. Blame for lack of progress must be placed in a large degree with the parents and in particular with the stepfather.

On our de novo review we agree with these findings. The parents recognize the children are happy in the current foster home and know they can't take them back now but seem to feel the children would more readily return to them if they were in another foster home.

The Iowa court considered the issue of bonding to foster parents in the case of *In re A.C.*, 415 N.W.2d 609 (Iowa 1987). The facts of *A.C.* are readily distinguishable from the matter before us. There was a finding in *A.C.* the foster parents sought to bond a permanent relationship. *Id.* at 615. No evidence of any such conduct exists here. In addition, the present placement is with the mother's brother and his wife. The children and these foster parents have a bonding that flows from a familial relationship that preceded foster placement and will continue beyond it. Their maternal grandmother and two older siblings have strong ties to the uncle's home. The children consequently maintain an excellent relationship with this extended family.

Multiple foster placements are detrimental to a child, may result in shallow indiscriminate emotional relationships in later years, and may become the source of antisocial, delinquent or criminal behavior. Comment, *Involuntary Termination of Parental Rights in Louisiana: Unraveling the Statute*, 58 Tul.L.Rev. 1045, 1046–47 (1984). Children who have formed emotional ties to a foster family suffer the same emotional effect upon removal as do children being moved from the biological home. Cole, *Advocating for Adoption*

*Services,* in Foster Children in the Courts 462 (M. Hardin ed. 1983). Each time a child is separated attachments may be broken generating insecurity and an inability to form future attachments. The inability to form attachments may permanently impair a child's ability to form loving relationships. Wald, *State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children From Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights,* 28 Stan.L.Rev. 623, 667 (1976) [hereinafter cited as Wald].

Because of the danger inherent in transfer from one foster home to another, we do not expand *In re A.C.* beyond its facts nor do we interpret it to dictate removal of children from one foster home to another just because significant bonding has occurred between the foster parents and the children. *See* Iowa Code § 232.102(6)(1985) (When the child is not returned to the child's home and if the child has been previously placed in a licensed foster care facility, the department or agency responsible for the placement of the child shall consider placing the child in the same licensed foster care facility.)

Because the counseling hasn't reunited the family, the parents argue if we change the placement then it will be easier for them to be reunited with their children. What they do not address is the fact there is no assurance a neutral foster home is available or that the children will adjust to another home. The right foster parents are not easy to find. There are reported cases of children being mistreated or abused in foster care. Wald, 28 Stan.L. Rev. at 645. It is easy to understand why good foster parents are not always readily available. Foster parents are poorly paid. As foster parents they are on twenty-four-hour-a-day call. They are given a job with incredible responsibility. They are given little training to handle their job. We have a large number of quality foster parents in this state, but not all foster homes are necessarily good homes. It is not always possible to detect what foster home will be a good foster home. Consequently, a move from one foster home to another is not made without considerable risk. We cannot determine a move to another foster home will correct the problems the parents have in communicating with the children, nor will it change the father's indifference toward the children.

We do not interpret *A.C.* to demand a move from a foster home merely because conscientious caring adults who assume total responsibility for the child become attached to the child and the child becomes attached to the adult, and the child has made a good placement. There is no basis to put these children in a new placement where they must adjust to new adult expectations about appropriate behavior, a new physical environment and perhaps new siblings and a new school. *See* Wald, 28 Stan.L.Rev. at 667.

The trial court is affirmed.

**AFFIRMED.**

All Judges concur except SCHLEGEL, J., and OXBERGER, C.J., who dissent.

SCHLEGEL, Judge (dissenting).

I respectfully dissent.

The majority states that it agrees with the findings of the juvenile court. Presumably, therefore, the majority must also agree with the court's findings that immediately precede the quoted portion set out in the majority opinion, which, when added to the part quoted by the majority, gives an entirely different meaning to the court's findings, as shown, to-wit:

> It appears to the parents that if the children remain with the Smiths they have effectuated a de facto termination of their parental rights.

> Perhaps there is some truth in the parents argument; however, they [the parents] [have been given a considerable amount of time, services and expenses in the opportunity to reunite their family. Progress toward reunification has been minimal if any. Blame for lack of progress must be placed in a large degree with the parents and in particular

with the stepfather.] (The majority's quotation has been bracketed above.)

As to the court's finding that "[b]lame for lack of progress must be placed in a large degree with the parents and in particular with the stepfather," one should review the chronology of events leading up to the hearing from which this appeal is taken.

1. The petitions alleging children in need of assistance were filed on July 16, 1986. On July 28, 1986, the order confirming removal of the children from the parents' home was entered and filed.

2. On August 29, 1986, an order was filed, finding the children to be children in need of assistance, and provisions for dispositional hearing were made and a date set for that hearing.

3. The dispositional hearing was held on September 30, 1986, and order of disposition was filed on October 1, 1986.

4. On December 17, 1986, over the objection of the parents, placement with the Smiths was continued. (The order shows no objections having been made, but the parents did object, with such objections leading to the termination of the services of the attorney representing them, and the appearance of a different attorney.)

5. On December 19, 1986, the parents, through their new lawyer, filed a motion to compel, directed at compelling the Iowa Department of Human Services (DHS) to carry out the order of the court, with respect to visitation and obtaining therapy from the counsellor for the children.

6. On December 30, 1986, an order compelling the DHS to comply with the court's prior order was entered and filed.

7. On January 28, 1987, the parents filed an application for hearing, asking the court to arrange a more specific visitation schedule and to clarify the counseling arrangement "with the stated intent to return the children to the parental home as quickly as possible."

8. On February 24, 1987, hearing was held on the parents' application, and the court set specific visitation schedules and therapy schedules, as well as changing the person in charge of visitation supervision and decisions.

9. On or about March 3, 1987, the parents filed an application for redispositional hearing, and hearing was set for March 31, 1987. Continuances were asked for and received by counsel for the children and counsel for the State.

10. Hearing on the parents' application for redisposition was held on May 11, 1987. The court's ruling was filed on August 4, 1987.

Under these circumstances, it seems quite hypocritical to find, as the court did, that "[b]lame for lack of progress must be placed in a large degree with the parents and in particular with the stepfather."

It appears obvious that the juvenile court and the majority have no commitment to the mandate of the statute and the order of the court in its initial order, that efforts be made to return the children to their parents as quickly as possible. The juvenile court, in fact, seems to find no urgency in the realization that the present placement will likely lead to a de facto termination.

The parents, and especially the mother, have made a very serious effort to do all that is required of them to acquire the return of their children. There is nothing to suggest that the move to Des Moines was improper or inappropriate, given the employment and education opportunities in Marshall County. Their goal is to improve themselves so that they can provide a better home for their children.

The majority claims there is no evidence that the foster parents seek to make the relationship between themselves and the children permanent. There is evidence that the uncle has assured the children that they will not have to return to their home, and that he will do anything in his power to keep that from happening. This is now denied, but it is clear that the present custodians are not committed to the purposes for which the department is required to work (i.e., the return of the children to their parents as quickly as possible). When their attitude is coupled with the

testimony of P.D., the children's mother, showing that there has been a bad relationship with the uncle, and the difficulty that has been encountered in picking up the children for visitation, it is improper to state that there is a lack of evidence that the present custodians seek a permanent placement. There is at least substantial evidence to show that there have been indirect proposals that the association with them will be permanent. Children are naturally attached to relatives, and are subject to the influence of being provided with many benefits that a normal foster parent could not or would not normally provide.

The uncle and aunt undoubtedly provide a more affluent life style for the children. They seem to show affection to the children, and the children evidence an affection to them. The bonding that has occurred between the temporary custodians and the children is such that it leads to the psychologist who has been working with this family to observe that it has likely made a return of these children to their parents unlikely.

*In re A.C.*, 415 N.W.2d 609 (Iowa 1987), will not be expanded by ordering removal of the children from the present custodians in this case. The following language of that case is appropriate here:

> There is a pressing societal need for temporary foster homes. The child victims of abuse are in desperate need of shelter and care. During the time required for courts or officials to process and consider their needs, the children must be nurtured in a safe environment.
>
> It should be apparent that one of the paramount needs of a child living under the stress of such unfortunate circumstances is to be free from *direct or indirect* proposals by those sheltering them to make the association permanent. To some it may seem innocent, even a good thing, to offer a permanent love to the child under temporary care. But unselfish temporary parents recognize that such a bonding is not kind. On the contrary it tends to be selfish on the part of

the adults and is highly likely to be harmful to the child.

> Temporary foster relationships must be designed with the knowledge they will almost certainly end in separation. The children often return to their natural parents. Often another solution must be found. Separation from foster parents holds the potential to be a painful experience. Such a separation would become unnecessarily cruel if the foster parents have led the children to believe placement in their home was permanent. [Emphasis added.]

*Id.* at 614.

The juvenile court stated:

> It appears to the parents that if the children remain with the Smiths they have effectuated a de facto termination of their parental rights.
>
> Perhaps there is some truth in the parents argument....

It thus appears that the primary motivation of the court is for the ultimate termination of the parental relationship between the parents and the children, and not for the speedy return of the children to their parents. While acknowledging that continued placement with the Smiths will cause a de facto termination, the court refuses to take the one step that will remedy that.

This is not one of the cases where there is any showing that failures in keeping scheduled appointments was due to the parents' neglect or abandonment of their roles as the parents of these children. Upon several occasions, the failure of appointments have been the fault of occurrences interfering with the schedule of the psychologist, or school activities of the children.

If the majority really believes that the mandate of the law, to return the children to their parents as quickly as possible, should be the goal in this case, then it must agree that the removal of the children from the temporary custodians, and the change of the venue of this case to Polk County, the residence of the family, with placement of the children in a foster home in Polk

County, is the desired procedure. In the present scheme of things, it appears that the majority holds out no hope that this family can ever be reunited, and that termination is the inevitable conclusion.

I would reverse the redisposition order and would order that venue be transferred to Polk County and the children be transferred to placement in a foster home in Polk County.

OXBERGER, C.J., joins this dissent.