# IN THE COURT OF APPEALS OF IOWA

No. 21-0301
Filed May 26, 2021

**IN THE INTEREST OF R.E.,**
**Minor Child,**

**A.E., Father,**
        Appellant.
_____

        Appeal from the Iowa District Court for Bremer County, Peter B. Newell, District Associate Judge.


        The father appeals the termination of his parental rights.  **AFFIRMED.**


        Jamie L. Schroeder of The Sayer Law Group, P.C., Waterloo, for appellant father.

        Thomas J. Miller, Attorney General, and Natalie Deerr, Assistant Attorney General, for appellee State.

        Kimberly Lange of Juvenile Public Defender's Office, Waterloo, attorney and guardian ad litem for minor child.


        Considered by Greer, P.J., Schumacher, J., and Gamble, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2021).

**GREER, Presiding Judge.**

The father appeals the termination of his parental rights to his child, R.E, born in 2017. The juvenile court terminated the father's parental rights pursuant to Iowa Code section 232.116(1)(e) (2020). On appeal, the father claims the State failed to prove grounds for termination, arguing the child has not been removed from his care for six consecutive months and he has maintained significant and meaningful contact with the child. He next claims termination of his parental rights is not in the child's best interests, and he asserts the court should have applied a permissive exception to termination based on the mother having custody of the child and his close bond with the child. *See* Iowa Code § 232.116(3)(a), (c). Finally, the father maintains the juvenile court should have ordered a hearing on his application for a bridge order. *See id.* § 232.103A (2021).

**I. Facts and Earlier Proceedings**

This family came to the attention of the Iowa Department of Human Services (DHS) in April 2019 due to concerns of substance abuse by both parents, the father's criminal activity related to his drug activities, and domestic violence issues between the parents. At the time, the child was residing with the mother and the father was incarcerated for crimes related to drug use. The child was removed from the mother's care and placed with the maternal grandparents in June 2019. A child-in-need-of-assistance (CINA) petition followed. Over the twenty-one months between the removal of the child and the termination proceedings, the father was either in jail or in a residential treatment facility for almost fourteen of those months. He acknowledges his legal issues, as well as substance-abuse and mental-health issues. The mother regained custody of the child in May 2020. But

as to the father, in September 2020, the State petitioned for termination of his parental rights. At the time of the January 2021 termination hearing, the child had been residing with the mother for seven months. The father never had physical custody of the child.

The father had opportunities for contact after he was discharged from the county jail in May 2019 and placed on supervised probation. Following his release, DHS offered the father supervised visits with the child twice per week. He attended one visit in June and two in July but missed others. DHS reported he sometimes arrived late and ended some visits early. He also was not compliant with DHS drug testing efforts. Then, in August 2019, the father was arrested for possession of methamphetamine, drug paraphernalia, and a stolen firearm, a violation of the terms of his probation. He remained incarcerated until March 2020; ultimately he received a ten-year suspended sentence related to the charges and probation violation and was placed on probation for five-years.

Once the father was able to have visits again after his March 2020 release from incarceration, the visits were scheduled via video conferencing because of the COVID-19 public health emergency. Those visits were not successful in the father's view, as he felt the video chat was not valuable in light of the child's young age. In April 2020, the father told DHS he refused to participate in drug testing until he was allowed face-to-face visits with the child. He skipped two drug tests in April, one in May, and three in June. Additionally, a probation violation report against the father was filed in May. For whatever reasons, the father did participate in a visit with the child in June and acknowledged there was an active warrant out for his arrest due to the probation violation. He was arrested in July and ordered

to participate in a 180-day stint at a residential treatment facility. He entered the facility in August but left early that month, resulting in an additional probation violation. He was arrested again in September; this time he was sentenced to a one-year suspended sentence and was ordered to spend one year in the residential facility or until maximum benefits were achieved. At the time of the termination hearing, the father's probation officer was in the process of filing a violation report because the father again contacted the mother in violation of a no-contact order.

During the twenty-one-month period DHS has been involved with the family, the father was in the community without court supervision for about four months—between March to July 2020. Between May and July 2020 there were ten non-DHS authorized unsupervised visits between the father, the child, and the mother, despite a no-contact order between the parents. The father claims he had an additional contact with the child in September 2020, but the mother says last contact was in August. She also testified the unofficial visits were of short duration, often when the child was sleeping. The family's DHS caseworker testified she believed the unauthorized visits were detrimental to the mother and child. The father argues he has maintained significant contact with the child and provided monetary support over the course of the twenty-one months. Yet, the support consisted of two payments totaling approximately $120, disposable diapers, a few items of clothing, and a bicycle. He has paid no child support to the mother.

The DHS caseworker testified the father did not participate in substance-abuse or mental-health treatment throughout these proceedings, although he took his prescribed medication to treat anxiety and depression. The father admits

struggling to maintain sobriety when out of jail or the residential facility. At the termination hearing, the father offered he was to begin substance-abuse treatment through an agency and that he was providing clean drug tests while at the residential facility. Yet, during the twenty-one month period since removal, he provided only one drug test for DHS. With these facts in mind, we address the father's claims.

**II. Standard of Review and Error Preservation.**

We review termination-of-parental-rights proceedings de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). Our primary consideration is the best interest of the child. *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006). An order terminating parental rights will be upheld if there is clear and convincing evidence of grounds for termination under Iowa Code section 232.116(1) (2020). *In re D.W.*, 792 N.W.2d 703, 706 (Iowa 2010). The State concedes the father preserved error on his claims.

**III. Analysis**

We review termination of parental rights using a three-step analysis. *P.L.*, 778 N.W.2d at 39. First, the court must determine whether a ground for termination under Iowa Code section 232.116(1) has been established. *Id.* Next, if the ground for termination is established, the court must then apply the best-interest framework set out in Iowa Code section 232.116(2). *Id.* Third and finally, if the best-interest framework supports termination of parental rights, the court must consider if permissive statutory exceptions in Iowa Code section 232.116(3) weigh against the termination of parental rights. *Id.*

**A. Grounds for Termination under Iowa Code Section 232.116(1)(e).**

For termination of parental rights to be proper under Iowa Code section 232.116(1)(e), the State must prove the following by clear and convincing evidence:

(1) The child has been adjudicated a [CINA] pursuant to section 232.96.
(2) The child has been removed from the physical custody of the child's parents for a period of at least six consecutive months.
(3) There is clear and convincing evidence that the parents have not maintained significant and meaningful contact with the child during the previous six consecutive months and have made no reasonable efforts to resume care of the child despite being given the opportunity to do so. . . .

The father contests only the second and third elements. As to the second element, the father theorizes the return of the child to the mother constitutes a return of custody to him as well. We disagree. Our review requires that we view the elements under the lens of the parent's individual skillset and relationship with the child. He cannot piggy-back on the parent who is doing the work to successfully nurture the child. Here, the father does not live with the child and has never had physical custody during the tenure of this case. Contact between the father and the child was solely within the discretion of DHS at the time the child was returned to the mother. And the order returning the child to the mother's custody did not mention the father; the order pertained only to her custody of the child. *See In re N.M.*, 491 N.W.2d 153, 155–56 (Iowa 1992) (holding that a father's custody of children did not preclude termination of non-custodial mother's parental rights); *In re C.H.*, No. 16-2179, 2017 WL 1278368, at *3 (Iowa Ct. App. Apr. 5, 2017) (determining removal means removal from either parent). The child has not been

in the care of the father for a period of at least six consecutive months. So the father did not meet the requirements for the second prong.

Next, the father contests the third element. He argues the State failed to show by clear and convincing evidence that he has not maintained significant and meaningful contact with R.E. during the previous six months and failed to make reasonable efforts to resume care of the child. Under Iowa Code section 232.116(1)(e)(3),

> "[S]ignificant and meaningful contact" includes but is not limited to the affirmative assumption by the parents of the duties encompassed by the role of being a parent. This affirmative duty, in addition to financial obligations, requires continued interest in the child, a genuine effort to complete the responsibilities prescribed in the case permanency plan, a genuine effort to maintain communication with the child, and requires that the parents establish and maintain a place of importance in the child's life.

The father points to the eighteen total visits, eight official and ten unauthorized, since removal as demonstrating he meets these requirements. But there is more to the role of being a parent. The expectations set for the father were to participate in substance-abuse treatment, mental-health counseling, drug testing, and maintaining contact with the child. While the father showed some interest in maintaining contact with the child, he failed to maintain significant and meaningful contact. Even in the eight authorized contacts he attended over the twenty-one months, there were times he arrived late or left early. When visits were required to be over video, the father only took advantage of remote visitation one time. While we understand remote visits are not ideal, the COVID-19 public health emergency justified these safety precautions. The unauthorized contacts covertly scheduled between the mother and father violated the case permanency plan and

no-contact order and it was unknown if the child actually had contact with the father. Overall, the father failed to demonstrate behavior showing his ability to be a successful, active, and involved parent.

Still, the father asserts he was not able to visit while incarcerated even if he had wanted to do so. True, the father has been incarcerated or committed to residential treatment facilities for most of the child's life. "[A parent] cannot use . . . incarceration as a justification for . . . lack of relationship with the child. This is especially true when the incarceration results from a lifestyle that is chosen in preference to, and at the expense of, a relationship with the child." *In re M.M.S.*, 502 N.W.2d 4, 8 (Iowa 1993).

As for the other requirements established by DHS, the father failed to follow through. Although treatment was recommended, the father failed to complete the treatment plan. The father admitted he was not able to stay sober throughout most of the time DHS was involved, except for the times he was incarcerated. Likewise, he did not comply with required mental-health counseling. As for the requirement to submit to drug testing, the father only submitted to one test for DHS, and it was positive. Other tests were refused.[1] The father resisted rules and the services offered by DHS. And in a candid moment with the DHS caseworker, the father addressed his continuing involvement in the criminal system, admitting "it was old playground and old playmates and he wasn't able to stay true to a course of sobriety [and] responsible living." Because of the father's consistent lack of contact with the child, his inability to work with DHS, and his lack of availability due to

---

[1] The refused drug tests led to the father's probation revocation in the spring and summer of 2020.

incarceration, we find that the father has not maintained significant and meaningful contact with the child, nor has he made reasonable efforts to resume care of the child.

**B. Best Interests of the Child.**

Next, we examine whether the termination is in the best interest of the child. *See* Iowa Code § 232.116(2). "In determining whether to terminate the rights of a parent . . . the court shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." *Id.* The father claims the juvenile court erred in finding termination is in the child's best interest. But the father has been absent for most of the child's life due to his criminal acts and has resisted taking the steps necessary to show he can successfully parent the child; namely substance-abuse and mental-health treatment. "Meeting the case plan terms offers a parent the opportunity to show his or her stability." *In re E.P.*, No. 19-1783, 2020 WL 1049540, at *3 (Iowa Ct. App. Mar. 4, 2020). The father exhibited little interest in complying with the case permanency plan, willingly flouting the plan directives. He has not shown he can take on a stable parenting role to nurture the child. "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *P.L.*, 778 N.W.2d at 41. Thus, we find termination of the father's parental rights is in the child's best interest.

**C. Statutory Exceptions to Termination.**

The father also points to permissive exceptions to termination, arguing we should apply 232.116(3)(a) and (c). Section 232.116(3)(a) applies when a relative has legal custody of the child. While it is true that the mother now has custody of the child, we do not think it is appropriate to apply the exception here. The father is currently not allowed contact with the mother, when they do have contact it is unhealthy, and she has said she supports termination of his parental rights. The DHS caseworker said the mother struggles to stay on track with her sobriety and healthy parenting goals when the father sporadically visits her and the child. Further, this child deserves permanency and stability, which would be disturbed if the father is in and out of R.E.'s life in between stints in jail and residential facilities. *See In re A.C.,* 415 N.W.2d 609, 613 (Iowa 1987) ("The crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems."). Thus, we decline to apply section 232.116(3)(a) to save the parent-child relationship.

The father also points to section 232.116(3)(c), which applies when "[t]here is clear and convincing evidence that the termination would be detrimental due to the closeness of the parent-child relationship." The father's sister testified to observations of the strong bond between the father and child, describing them as "inseparable." But she also admitted that, to her knowledge, the father had not seen the child for six months prior to the termination hearing. We do appreciate that the father loves this child. But, while the child has asked about the father at times, given the months he has been absent from the child's life, we cannot say the child is so bonded to the father that this exception should apply. We decline

to apply either exception in Iowa Code section 232.116(3) to prevent termination of the father's parental rights.

**D. Denial of Application for a Bridge Order.**

The day before the termination hearing, the father applied for a bridge order with the juvenile court. *See* Iowa Code § 232.103A (2021). He asked for the juvenile court to continue the termination hearing so that he could be heard on his application, arguing that since the mother had custody and the child was safe with her, a bridge order would allow the CINA case to close. The juvenile court denied his request. To qualify for a bridge order, certain criteria must be met. Section 232.103A provides:

> 1. The juvenile court may close a [CINA] case by transferring jurisdiction over the child's custody, physical care, and visitation to the district court through a bridge order, if all of the following criteria are met:
> a. The child has been adjudicated a [CINA] in an active juvenile court case, and a dispositional order in that case is in place.
> b. Paternity of the child has been legally established, including by operation of law due to the individual's marriage to the mother at the time of conception, birth, or at any time during the period between conception and birth of the child, by order of a court of competent jurisdiction, or by administrative order when authorized by state law.
> c. The child is safely placed by the juvenile court with a parent.
> d. There is not a current district court order for custody in place.
> e. The juvenile court has determined that the [CINA] case can safely close once orders for custody, physical care, and visitation are entered by the district court.

Here, the DHS caseworker testified she did not feel the CINA case could be safely closed due to the unhealthy dynamic between the father and the mother. And the mother and father proposed no plan for ongoing custody or visitation, and past interactions had not been healthy. To that end, the juvenile court reasoned "[the father] did not have any proposal as to what a bridge order should look like other

than at the discretion of the mother. My continued fear for the family is the unhealthy dynamic [he] brings into his family with his criminal mentality." Because the criteria for a bridge order were not established, we agree with the juvenile court and the DHS caseworker's concerns. *See In re L.M.*, No. 19-0426, 2019 WL 2373649, at *3 n.2 (Iowa Ct. App. June 5, 2019) (noting continued concerns for the children's safety precluded the use of a bridge order).

**IV. Conclusion.**

We affirm the juvenile court's order terminating the father's parental rights to this child under Iowa Code section 232.116(1)(e). Termination in is the child's best interests, and we decline to apply any of the permissive exceptions to termination under section 232.116(3). We agree with the juvenile court that a bridge order was not appropriate in this case.

**AFFIRMED.**