**IN THE COURT OF APPEALS OF IOWA**

No. 21-1444
Filed January 12, 2022

**IN THE INTEREST OF T.H.,**
**Minor Child,**

**G.F., Father,**
　　　Appellant.

_____

Appeal from the Iowa District Court for Lee (North) County, Daniel P. Kitchen, District Associate Judge.

The father appeals from the termination of his parental rights. **AFFIRMED.**

Reyna L. Wilkens of Wilkens Law Office, Fort Madison, for appellant father.

Thomas J. Miller, Attorney General, and Toby J. Gordon, Assistant Attorney General, for appellee State.

Justin Stonerook, Assistant State Public Defender, Burlington, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Greer and Badding, JJ.

**GREER, Judge.**

The biological father,[1] G.F., appeals from the termination of his parental rights to his child, born in 2013.[2] He argues (1) there was insufficient evidence to show termination was the least-restrictive disposition, (2) the State did not make reasonable efforts to help reunite the family, and (3) the court should have given him a six-month extension of services. Because termination proceedings are not bound by choosing the least-restrictive disposition and the father has not pointed to specific services he was not provided nor changes he could make to achieve reunification in six additional months, we affirm the juvenile court's termination of his parental rights.

**I. Statement of Facts.**

The child first came to the attention of the Iowa Department of Human Services (DHS) in August 2015 while living with her biological mother, H.H., and two half-siblings. The three children were adjudicated children in need of assistance (CINA). The children were placed in foster care. While incarcerated, the father sent DHS a letter stating he was T.H.'s biological father and, once paternity was confirmed in November, the State initiated services. Although he was then out of jail, the father did not engage. Yet, later the father did engage and began contact with the child in June 2016. The child remained under the jurisdiction of DHS because of the unsafe conditions related to her mother's and

---

[1] We refer to G.F., the biological father, as "father" in this opinion.
[2] The mother's parental rights and those of the child's legal father were terminated on August 12, 2020.

father's disruptive behaviors.[3]  But, the father made progress with services provided and took over physical care of the child in July 2019.  The father claims services were not adequate to help him from the time the child moved into his home in July until DHS removed her in February 2020.  Yet, at the time of the termination hearing, DHS involvement with the child spanned nearly six years, and the father had been given the opportunity for services since November 2015—a total of sixty-six months.

Even with supportive services, in January 2020, DHS received reports that the child had been sexually abused by an older child also living with the father.  The older child had a history of sexually inappropriate behavior, and the father was cautioned by DHS that the children should always be supervised when together.  He did not follow this instruction, and the older child acted out against T.H. when they were left alone together.  At the same time, DHS found out the father assaulted his then-wife, K.L-F., and hit one of the other children in the home hard enough to leave a baseball-sized bruise.  The father was charged with domestic assault.

During DHS's investigation of the incident, workers entered the home and found a number of safety hazards, including prescription medication within a child's reach, dirty dishes and trash on the counters and floor, undisclosed individuals living in the home, dirty diapers on the floor, clutter blocking the stairs, electrical cords on the floor, and cleaning detergent in a child's crib.  As the investigation

---

[3] Home studies in 2016 and in 2017 concluded it was not safe for the child to be in the father's home.  The child was returned to the mother's care in 2017, but DHS again removed the child from the mother's home in January 2018.

escalated, the father sent T.H. across state lines to live with her paternal grandparents to avoid the State involvement.[4]  While incarcerated for domestic assault, the father told workers that he felt unable to care for all of the children at once and hoped T.H. would be placed with the paternal grandmother.

In February 2020, the child was removed from the father's care and placed with a foster family.  At the review hearing, the father "stipulated that substantial evidence exist[ed] to believe the removal of the child [was] necessary to avoid imminent risk to the child's life or health."  The juvenile court ordered the father to complete a substance-abuse evaluation and any recommended treatment; find and keep employment; show the ability to consistently keep a clean and stable home; address safety concerns in the home; undergo mental-health treatment and take prescribed medication; attend the child's medical, counseling, and educational appointments; and participate in services and visitation as directed.  A number of these concerns went unheeded.

As 2020 progressed, the father's lack of engagement was glaring.  For example, he was resistant to participating in drug-related services.  Before taking in the child, the father reported a history of methamphetamine use.  While it had been several years since he last tested positive or admitted to use, in the months leading up to the termination hearing, he repeatedly rebuffed drug testing and insisted on being given warning ahead of his testing dates.  In the months before the termination hearing, he went so far as to shave all the hair on his body to avoid

---

[4] The father's Facebook page has posts discussing K.L-F's family taking the children out of state to hide them from DHS.

giving a hair sample.[5] The father reported marijuana use in past medical appointments, though he later denied it.

The State argued the father lacked the ability to maintain clean and stable housing. In the months between removal and the termination hearing, the father had stints in jail and out-of-state shelters. When back in Iowa, the father returned to the same apartment DHS found unsafe, now leased by his sister. The home still posed a number of concerns. Workers reported that the space was too unsanitary for the child to have visits there, citing dirty dishes, trash, piles of clothing, and rodents. Still, the father argued that the mess was made by others in the home and so was not his responsibility to clean. Other houseguests were also a source of regular conflict, including even physical violence, which the child witnessed in her time there.

As an additional concern, the father consistently struggled with his mental health. Soon after the child's removal, the father failed to participate in mental-health services or regularly attend counseling appointments. He repeatedly stopped taking his medication, either lying about his doctor's instructions or ignoring them altogether. In January 2021, the father underwent a mental-health committal resulting in a court-ordered requirement to participate in mental-health services and medication management. Following a slow start with missed appointments, he began to comply more consistently as of February 2021.

Services for the child included counseling following her removal from the father's care. In these sessions, the child discussed some traumatic experiences

---

[5] At trial, the DHS caseworker testified hair samples can show drug use for a longer period of time than a urinalysis.

from her time in G.F.'s care, such as being hung from a nail on the wall by her clothing. She also shared examples where the father was physically or verbally aggressive toward her, K.L-F., and other children in the home. The child told her counselor she would prefer not to see the father or attend visitation with him. Because of T.H.'s fear of the father, the counselor recommended visitations remain fully supervised. The father denied he ever hung T.H. on a wall, and he chastised the child during visits for telling people she was afraid of him. T.H.'s counselor requested the father work toward participating in the child's sessions to try and resolve the situation—but G.F. never called to set an appointment.

Other concerns over the father's ability to reunite with the child exist. G.F. struggled to maintain consistent visitation with the child. Besides the barrier of clean housing for visits, the father cancelled visits because of work, out of anger, because he had no food to feed the child, or because he only wanted to see the child if he could see his other children as well. Visits never progressed from being fully supervised, in part because the child did not want to be left alone with her father.

Barriers existed because the father has been generally hostile towards DHS's involvement. He threatened providers, lashed out at the foster parents, repeatedly refused services, failed to sign releases, and seemed unable to grasp why his behavior would be unsafe for the child. And when he did engage, the conversations were described as "unproductive," making it difficult to move towards reunification.

Yet, the father made some progress. At the May 2021 termination hearing, he had a job that he had maintained for about five months. He was reported to

have made positive budgeting choices. He also recently engaged in mental-health treatment and medication management. In the positive column, the father provided a clean drug test in March 2021 and did not have any behavioral indicators of continued drug use.

Still, as the juvenile court wrote in the termination order:

By February of 2021, [the father] had received or refused services to his family for six (6) years.[6] His home continued to be unsafe for [the child]. [The father] demonstrated no interest in making the changes necessary to provide [the child] a safe, sanitary, and stable home free from abuse.
. . . .
. . . [The Father] ha[d] been unable or unwilling to make sufficient progress (with the support of [DHS]) toward consistently providing a safe and nurturing home during the marathon [CINA] case.

A termination trial was held in May 2021. While the father was present, he did not testify or present any evidence. The juvenile court ordered termination of the father's parental rights in September of 2021 citing grounds under Iowa Code section 232.116(1)(e) and (f) (2021).

**II. Standard of Review.**

We review termination-of-parental-rights proceedings de novo. *In re L.T.*, 924 N.W.2d 521, 526 (Iowa 2019). We give weight to the juvenile court's findings of fact, particularly toward the credibility of witnesses, but are not bound by them. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).

---

[6] For a portion of this time, G.F. was receiving two sets of services—one for T.H. and another for his children with K.L-F.

**III. Waiver.**

In his petition on appeal, the father lists various facts he believes the juvenile court incorrectly found, yet he offers no rebuttal evidence to confront those facts. While we recognize this is an expedited appeal process, we are still limited to what was properly raised for our review. *See* Iowa Rs. App. P. 6.201(1)(d) ("The petition on appeal shall substantially comply with form 5 in rule 6.1401."); 6.1401–Form 5 ("[S]tate what findings of fact or conclusions of law the district court made with which you disagree and why, generally referencing a particular part of the record, witnesses' testimony, or exhibits that support your position on appeal . . . . *General conclusions, such as 'the trial court's ruling is not supported by law or the facts' are not acceptable.*"); *see also In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000) ("A broad, all-encompassing argument is insufficient to identify error in cases of de novo review."); *cf.* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."). Instead, his focus only relates to arguments that termination was not the least restrictive option, that DHS failed to make reasonable efforts to reunify him and the child, and that he should have been granted a six-month extension before his rights were terminated. Other issues are considered waived.[7]

---

[7] One of the issues the father does not address is the best interests of the child. This consideration is typically the second step of our review of a termination of parental rights. *D.W.*, 791 N.W.2d at 706–07. But, as the father does not contest the district court's finding on the issue in this appeal, we do not address it. *See In re C.Y.*, No. 19-1806, 2020 WL 1049541, at *1 (Iowa Ct. App. Mar. 4, 2020) ("Because the father does not challenge the juvenile court's determination that terminating his parental rights is in the child's best interests . . . we do not consider the second [step]." (citing *In re P.L*, 778 N.W.2d 33, 40 (Iowa 2010))).

**IV. Discussion.**

The father's challenge boils down to wanting more time to prove he can reunite with the child. He argues that the court could not have found termination was the least restrictive option and that he was not provided the services he needed to achieve reunification. Because of this, he asks for a six-month extension rather than termination.

**A. Least-Restrictive Disposition.**

In framing his argument, the father asserts termination is not the least-restrictive disposition. He cites Iowa Code sections 232.99(4) and 232.102(4)(a), which state a preference for keeping children with their parents. But, these statutes deal with dispositional hearings for CINA proceedings, not for permanency hearings—so, they are not relevant to our review today. *See* Iowa Code § 232.102(4)(a) ("Whenever possible the court should permit the child to remain at home with the child's parent, guardian, or custodian."). Instead, with termination hearings, "[o]ur caselaw has recognized that the interests of the child take precedence over family reunification. Our primary concern in termination proceedings has always been the best interests of the child." *L.T.*, 924 N.W.2d at 529. Because the least-restrictive standard defined by the father does not relate to the issues in this appeal, we do not consider this argument and instead focus on the father's reasonable-efforts argument and his request for an extension.

**B. Reasonable Efforts.**

As noted, the father does not directly challenge the specific grounds supporting the termination. Instead, he argues that reasonable efforts to reunify him with the child were not made. *See id.* at 527 ("'[T]he reasonable efforts

requirement is not viewed as a strict substantive requirement of termination.' Still, where the elements of termination require reasonable efforts by DHS, the scope of DHS's efforts after removal impacts the burden of proving those elements." (alteration in original) (citation omitted)). In particular, he believes he was not provided services when the child was *first* placed with him. Our statutes require, if custody is transferred to DHS, that DHS "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child." Iowa Code § 232.102(7). "'[R]easonable efforts' means the efforts made to preserve and unify a family prior to the out-of-home placement of a child in foster care or to eliminate the need for removal of the child or make it possible for the child to safely return to the family's home." *Id.* § 232.102(10)(a).

Nevertheless, "[a]lthough DHS must make reasonable efforts in furtherance of reunification, with some exceptions not applicable here, parents have a responsibility to object when they claim the nature or extent of services is inadequate." *In re L.M.*, 904 N.W.2d 835, 839–40 (Iowa 2017) (footnote omitted). Without such a flag for the court, the issue is considered waived. And while the termination hearing transcript reflects that there was some point in the past where the father told the court reasonable efforts were not being made, it was only a general statement. We do not have a record of any specific request for services that went unmet. So, we cannot determine if error was preserved. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). Even if he had preserved error, though, he has not pointed us to specific services he was not provided—as

such, we cannot provide a remedy. *See In re S.B.*, No. 17-0221, 2017 WL 2184830, at *3 (Iowa Ct. App. May 17, 2017). Additionally, the father has not explained how these services would have made him a safer parent and enabled reunification with T.H. *See In re E.W.*, No. 19-0163, 2019 WL 2369901, at *1 n.2 (Iowa Ct. App. June 5, 2019). Instead, we find from the record that the father thwarted the services offered at each step of the process. The juvenile court described the efforts made by DHS as "extraordinary," and we agree.

Taking another approach, the father argues that he was not provided services for the same length of time as T.H.'s mother. While it is true the mother had years of services, similar opportunities for services were offered the father around the same time. And, at least since early 2020, when the child was removed from the father's home, services were solely focused on the father—he just chose not to participate. As his circumstances were different than those of the mother, the services offered or time frames provided need not be identical. *Cf. In re M.P.*, No. 19-0995, 2019 WL 5063337, at *4 (Iowa Ct. App. Oct. 9, 2019) ("But the reasonable-efforts mandate does not create a menu from which discerning parents may order specific services. Rather, it is intended to provide services that facilitate reunification given the parent's circumstances."). The father has not established that DHS failed to make reasonable efforts for reunification.

### C. Six-Month Extension.

Finally, the father argues that he should have been granted a six-month extension rather than having his rights terminated. Iowa Code section 232.104(2)(b) allows a six-month extension when the court can enumerate "specific factors, conditions, or expected behavioral changes which comprise the

basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." Other than some references to a six-month extension during cross-examination at the termination trial, we find no request for an extension below, and the juvenile court was not asked to award an extension of time. On appeal, the father fails to identify how any specific changes over an additional six months could solve the complex issues that have earlier prohibited reunification. And, while he might not believe that the additional time is harmful to the child, our case law has long recognized that children require permanency. *See In re A.C.*, 415 N.W.2d 609, 613 (Iowa 1987) ("The crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems. Neither will childhood await the wanderings of judicial process."); *see also In re O.W.*, No. 20-0923, 2020 WL 5651688, at *2 (Iowa Ct. App. Sept. 23, 2020) ("Because the child requires the permanency that termination affords, we affirm the termination of the father's parental rights."). The child is in a pre-adoptive home with a sibling with whom she is bonded, a situation that can provide her with the sort of permanency she deserves. *See D.W.*, 791 N.W.2d at 709. We agree with the juvenile court's choice not to delay any further.

**V. Conclusion.**

Because the father cannot point to either reasonable efforts not made or changes that could result in reunification if given a six-month extension, we affirm the termination of his parental rights.

**AFFIRMED.**