**IN THE COURT OF APPEALS OF IOWA**

No. 15-0131
Filed March 25, 2015

**IN THE INTEREST OF J.S.,**
**Minor Child,**

**E.S., Mother,**
**Appellant.**

_____

Appeal from the Iowa District Court for Linn County, Susan F. Flaherty, Associate Juvenile Judge.

A mother appeals from the juvenile court order modifying the dispositional order in a child-in-need-of-assistance proceeding. **AFFIRMED.**

Jessica L. Wiebrand, Cedar Rapids, for appellant mother.

Thomas J. Miller, Attorney General, Bruce Kempkes, Assistant Attorney, General, Jerry Vander Sanden, County Attorney, and Rick Sole of Sole & McManus, P.C., for appellee State.

Angela Railsback, Cedar Rapids, attorney and guardian ad litem for minor child.

Considered by Vogel, P.J., and Doyle and McDonald, JJ.

**DOYLE, J.**

A mother appeals the modification of a dispositional order removing her child from her care, though she does not specifically challenge the juvenile court's determination that modification was in order. Rather, she takes issue with the court's decision to transfer the child's custody from her to the Iowa Department of Human Services (Department) for placement of the child in the care of a non-relative family with whom the child has been residing with the mother's prior permission. The mother maintains the family has interfered with her relationship with her child, and she requests the child be moved to a new foster family, against the child's wishes. She also asserts the court erred in finding the Department provided reasonable services "to maintain [the child] in the mother's care and custody." Upon our de novo review, we affirm.

### I. Background Facts and Proceedings.

E.S. is the mother of J.S., born in 2003. The mother herself had a challenging childhood, and she immigrated to the United States as an adult. The mother married the child's father in 2002, and their marriage was fraught with physical and emotional abuse of each other, and sometimes, their children.[1]

In April 2007, the Department became involved with the parents after it was reported that the father physically abused the child. Specifically, the Department determined that during a fight between the parents, the father put a jump rope around the child's neck, threatened to choke the child, and then pulled

---

[1] The child's father is not involved in this appeal, but his and the mother's history are relevant to the issues raised here. Additionally, we note the mother and the father both have other children from separate relationships not at issue in this appeal. The mother's oldest child was born in 2001, her youngest in 2011.

the child around by the rope. This resulted in petechiae around the child's neck, but the child was not otherwise physically injured. Thereafter, the mother moved out and took the child with her. A no-contact order was put in place between the parents, and both parents agreed to participate in voluntary services with the Department. The parents remained separated thereafter, and they finally divorced in 2011.

In May 2007, the father made allegations that the mother was abusing the child, but the report was not confirmed by the Department. The State subsequently filed a petition asserting the child was a child in need of assistance (CINA). At some point, the child was adjudicated CINA.

In September 2007, the Department confirmed a report of physical abuse by the mother against the child after the mother left claw marks on the child's arm after grabbing it. The child initially reported she was scratched by a cat, but the mother later admitted she had caused the scratches, claiming she accidentally grabbed the child's arm too hard. However, a physician opined that the child's injuries "were significant," "could not be caused by accidental grabbing," and "were intentional." There were other abuse allegations, but only this particular report was confirmed by the Department. The mother again agreed to participate in services and signed a safety plan that she would refrain from using physical means to discipline the child.

In 2010, the Department received a report that the mother had left the child, then six-years-old, at home alone with her eight-month-old sibling. The mother admitted she had left the children home alone but claimed it was only for a "couple of minutes." She also denied it had happened before, but the child

recalled at least another instance, which was confirmed by the mother's paramour. The Department determined the report that the mother had denied the child critical care was founded. The mother and her paramour agreed they would not leave the children alone again.

New allegations of abuse by the mother were asserted a month later after the child had a large scratch on her face by her eye, and neither the mother nor her paramour knew how the child had acquired the scratch. The abuse report was not confirmed, but the mother and her paramour signed a safety plan stating again that they would not leave the children without supervision at any time.

The child was under the supervision of the juvenile court and the Department from 2007 to the summer of 2011, when the CINA case was dismissed. However, it appears there was little oversight of the family during that time, and despite the numerous abuse allegations and findings, the child and her siblings were never removed from the mother's care. The juvenile court explained

> the latter stages of [those CINA] proceedings . . . remained open largely to assure stability in the placement for the child while [the] parents litigated their divorce and obtained permanent custody and visitation orders for [the child]. Although the juvenile court orders provided for [the mother] to be [the child's] primary custodian, with [the father] having a plan for visitation, the parents reached an agreement in district court that placed [the child] in the primary care of her father, and final custody orders were entered in May or June of 2011.

Even though the mother failed to follow the juvenile court's orders concerning obtaining custody of the child, the CINA proceedings were dismissed shortly after the decree was entered. The Department's case worker and the child's guardian ad litem (GAL) both signed off on placement of the child with the father because

the father was the parent following the case plan at that time, making sure the child got to medical, dental, and therapy appointments.

Just after the dismissal, while the child was living with the father, it was alleged the father had sexually assaulted his paramour's thirteen-year-old daughter. A criminal investigation commenced thereafter, and the Department was concerned about the child being in the father's custody, particularly after a container stored in the child's closet was discovered containing the father's sex toys and a pair of a small child's Dora the Explorer underwear. Following the criminal investigation, the father was charged with and ultimately convicted of multiple counts of possession of child pornography, and he is presently incarcerated in federal prison.

After the Department learned of the allegations against the father, the child was removed from the father's care and placed in the mother's custody, where she legally remained until 2014. The child was again adjudicated a CINA, and the mother was directed to continue the child's therapy, given all that had happened. The mother did not believe the child needed therapy, and her contribution in seeing that the child received treatment was sporadic, at best.

However, the mother did enroll the child in a community mentoring program after the child was placed in her care in 2011. There, the child met and began a relationship with a participating family ("Family"). With the mother's permission, the Family enrolled the child in extracurricular activities, paying for and taking the child to and from the activities. At times, the mother was not home when they went to return the child home—without any advance notice to the Family—so the Family took the child home with them. With the mother's

permission and occasionally at her request, the child began spending more and more time with the Family. The child went camping with the Family. The child spent holidays with the Family. The child went with the Family out-of-state for a week-long trip in March 2013. This was all done while under Department and court supervision, though permission was not sought by the mother. At the same time, the Department had so little contact with the mother it never discovered the child's connection with the Family. The Family did not even know at that time there was any involvement by the Department or the juvenile court.

By January of 2014, the child was staying with the Family regularly with the mother's permission. The mother did not pack clothes or toiletries for the child; the Family had to provide that on their own and did so willingly. The Family even attended the child's school conference in 2014. The child took another week-long trip with the Family in March of 2014, and it was at that time the Family learned the Department was involved in the child's life, though they were unclear as to the extent of the involvement. The Family made various vacation plans for the summer of 2014, and the mother consented to the child travelling with them. By the end of the school year, the child had lived with the Family more during that year than she had at her mother's home.

After school ended in June 2014, the child began living with the Family full-time. Shortly thereafter, the Department learned the child had been living with the Family. The Department subsequently filed an ex-parte request for the child's immediate removal from the mother's care, asserting the child was at imminent risk of harm in her mother's custody due to the mother's lack of follow through with the child's therapy and the mother's decision to let the child live with

the Family, among other things. The court denied the Department's request, finding the Department did not establish the child was in imminent danger, but it referred the matter to the State for possible filing of an application to modify the dispositional order, which the State did in July 2014.

The Family continued on with their summer vacation plans, taking the child with them with the permission of the mother. While travelling, the Family had spotty cell-phone coverage. The mother was displeased with the timeliness and content of the responses she received from the Family and the child while gone, though she had been told about the cell-reception issue. Shortly after they returned home in August 2014, the mother called to talk to the child, and their conversation ended with the child crying and refusing to talk to the mother. The mother then sent a text message to the Family saying she wanted the child home now, and the child refused. Thereafter, the mother showed up at the Family's home with her other children demanding the child be returned to her and screaming at the Family. The Family called the Department's case worker; the mother called the police department asserting the child had been kidnapped by the Family.

The case worker spoke with the child after she arrived at the Family's home, and the child was in her room crying, "very upset and emotional." She told the worker she was scared of her mother and her older sibling, stating they had hurt her in the past and she was afraid to go home. That day, the worker filed another application for removal of the child from the mother's care, and the juvenile court subsequently entered a temporary removal order placing the child

in the Department's custody and authorizing placement of the child with the Family, with the mother having supervised visitation with the child.

The child had two visits with the mother in August that went well, for the most part. However, at some point, the child stated she did not want to have visits with the mother. Ultimately, the Department determined the child did not have to go to the visits if she did not want to, and the visits were basically stopped. The mother began sending numerous angry text messages to the Family, using foul language and calling the Family foul names, and their relationship further deteriorated. Additionally, therapy was reinitiated by the Department, but the mother was generally uncooperative, causing delays in getting the child's therapy restarted. The child eventually began attending individual therapy and family therapy with the mother.

A new case worker for the Department was assigned in or about September 2014 and that worker noted the visitation was court ordered and could not be stopped based upon the refusal of the now eleven-year-old child. Visits were then "restarted," but the child was still permitted to choose whether or not she would go to the visit. The child declined to go every time.

By the time the hearing on the application commenced in October 2014, the child had begun addressing the mother by her first name and adamantly wanted no contact with the mother or her siblings. At the conclusion of the first day of the hearing, the court ordered that visitation continue, and the court spoke to the child about the need for the visits and informed the child visitation was not a choice. The child requested the time she spent with the mother in family therapy be counted as her visitation time, and the court declined the child's

request, stating the child needed to have some visitation with the mother outside of therapy.

Visitation between the child and mother and the child's siblings resumed, but the child wanted nothing to do with the mother or her siblings. The child refused to give the mother hugs when requested. The mother and child also fought during their family therapy sessions.

At the October hearing dates, both the prior and present case workers for the Department, as well as the mother's service provider, testified. The prior case worker believed the child was at imminent risk of danger for numerous reasons, including the child's allegations, but she admitted she had no contact with the mother from September 2013 to April 2014. That worker testified the mother was extremely difficult to get a hold of, but neither the new case worker nor the service provider had any difficulties reaching her. Based on the child's allegations and the mother's leaving the child with the Family, the prior worker believed removing the child from the Family's care was not in the child's best interests, testifying that much family therapy was required to get the child to a place where she felt safe with her mother. The worker did not believe the Family had interfered with the mother's relationship with the child but were rather looking out for the child's best interests and the child's wishes. Additionally, the worker recommended the mother have a mental health evaluation.

The new case worker testified, but she had had little involvement in the case at that point. However, she did not think the Family had interfered with the mother and child's relationship. She testified the Family had been cooperative, and they were "thrown for a loop when all of the sudden they became the bad

guys in this scenario, and they just felt like they did everything that they could to help support [the child and the mother] and it kind of fell apart over the summer." She testified she thought the Family was "doing their best to understand the court process, but sometimes things get miscommunicated or they don't always fully understand what [the Department's] process is or how things work, but . . . they are doing their best."

The service provider who had been involved with the mother and child since 2013 disagreed. She testified she had not observed a strain in the mother and child's relationship before the August 2014 removal, but since, the child had become "very shut down and very negative" with the mother and her siblings. The provider testified she believed the child's change of behavior was because the child had been put in the middle of the conflict between the mother and the Family. The provider did not feel the mother had contributed to putting the child in the middle, testifying she believed the Family was "partially responsible" and had "somewhat" interfered with the reunification process. The provider pointed to a recent "incident" where a visit was set up between the mother and child with the Family for later in the day and the Family was to have the child ready to go. But, when the provider went to pick the child up three hours later, the visit had been forgotten and the child was not ready to go—the child was actually at the park with a friend. The provider admitted the child was immediately retrieved from the park by the Family for the visit. Additionally, the provider admitted she only spent from twenty minutes to an hour in the mother's home once a month and may not have been fully aware of all of the issues and problems occurring in the home. The provider pointed to the lack of direction and response from the

Department as the reason the provider was not further involved, but she admitted it was the mother's responsibility to follow the court's orders and that the mother had not done so.

The hearing recommenced in December 2014, and the mother testified. The mother gave excuses for why she failed to continue the child in therapy, despite the court's direction that it was necessary. The mother blamed her prior attorney, the Department, and the birth of her youngest child, and she never accepted any responsibility for her involvement. However, she admitted she had not thought the child previously needed therapy, questioning the use of the play therapy technique, but she testified she now believed the child did need help "because of what is happening now." The mother testified she did not realize at the time "how difficult [the child] was getting through with [the father]" or that it was "going to be very complicated [to the child] to realize what really happened." She also claimed the first therapist told her the child would be brainwashed by therapy and the child should not see anyone until after she turned eighteen. When asked if she felt she had any role or any part in the breakdown of the parent-child relationship, the mother simply testified she did "the best [she] could to help [the child] forget what really happened to [the father], and maybe [she] overdid it."

The mother testified she believed the child had been brainwashed by the Family, testifying the child was like their puppet. She believed the child only liked living with the Family because there she was an only child and the Family had more money than the mother. She justified sending nasty text messages to the Family, stating that "if somebody did some bad stuff, of course it's going to be

dirty." She testified she believed "the people holding [her] daughter . . . are nuts. They should not be stealing somebody's child. It is a kidnapping. Sideways, backways, it's the wrong way. I swear to God they will be responsible for what they have done." She admitted she had gone to the police again in October 2014 and reported the Family had kidnapped the child, even though she was well aware of the court's prior removal order. She testified she wanted the child placed in foster care, out of the Family's care, because the Family had damaged the child. The mother admitted the child had not wanted to talk to her and said bad things to her during their most recent visits but testified if the child came home with her,

> [e]verything will be fixed. . . . [S]he is still my daughter, and we still have so much love for her and time will fix anything. It will be a little bit [of] struggling and it will be a little bit difficult because she got so much through from somebody, but it will fix anything. . . . [S]he probably needs more therapy and go see some different person to help her heal, but she will be okay.

The mother testified she wanted the child back home with her no matter what, but if the Department did not think the time was right yet, she would work with the Department.

Finally, the juvenile court met with the child on the record outside the presence of the attorneys and the mother. The child was intelligent and stated she understood what it meant to be truthful. The court explained its responsibility in the case and the presumption that children's best interests are served by placement with their parents, and the child adamantly did not want anything to do with the mother. The court also explained that though the child felt that way now, her opinion might change over time such that visitation now was important. The

child disagreed and did not see herself changing her mind. The child told the court the mother "hits [her] and stuff, like bad." She stated that when she was younger and went to her paternal grandmother's house, her grandmother would ask why she had bruises on her legs, and the bruises were from the mother. The child explained she did not want contact with her mother or siblings because "they hit people and don't give anyone privacy and they don't care about if you get in a fight at school or get bad grades." The child elucidated that "last year [her older sibling] got suspended from school three times from hitting people. And that was her first year in middle school and [the mother] didn't care." The child also stated the child had "had one bad grade and [the mother] didn't care." The child stated that while living with the Family she had had time to do her homework and had made the honor roll. She said at her mother's house, she had no bedtime or privacy, but she did at the Family's home. She told the court she was going to family therapy with her mother, but they fought there. The child described an instance at therapy when the mother had questioned the church the child was attending with the Family because the mother "just wanted to be sarcastic," so the child walked out. The child stated she and the mother were divided before the child started staying with Family, and she told the court when the Family asked the mother if the child could stay with them, the mother "right away" handed over to the Family the child's "social security card and . . . glasses prescription and stuff. And then at one point, . . . [the mother] said . . . she just wants me to be happy. Then why would she let me go [out of state on vacation with the Family], and then why would she let me go live [with the Family] for the

summer." The child told the court the Family was the opposite of her mother and that many things the mother had said were untrue, such as her mother saying

> that [the child] told [the Family] that [the child] wanted to go back [to her mother's house], and [the Family] didn't speak to [the child] for the rest of the day. That never happened.
>     . . . .
>     But what really did happen, [the child] said to [the mother] that [the child] miss[ed] [the Family], and [the mother] didn't speak to [the child] for the rest of the day.

The child told the court she believed her younger siblings were safe because they spent most of their time with their father, but she did not know if her older sibling was safe.

At the end of the hearing, the court advised the parties that its short term plan would be for the child to remain with the Family, but the parties needed to address the permanency goal and how to get to a family reunification plan. The court told the child that although she could stay with the Family for now, the goal was to continue to work on her relationship with her mother and biological family through therapy. The court directed the mother to participate in individual counseling and receive parenting instruction. The court asked the mother about whether her oldest child had been suspended from school, and the mother admitted the child had been suspended once "because of a big fight or some kind of issue," but she minimized the issue as being "[j]ust what all kids do when they grow up and are going through older stuff." The court noted the child was also concerned with the child's relationship with her older sibling, and the court directed the mother to involve that child in family therapy.

The court subsequently entered its written order modifying the dispositional order, officially removing the child from the mother's care and

placing the child in the Department's custody "for purposes of placement with [the Family] as suitable adult caretakers." The court's order noted that although it had "several concerns regarding the [Department's] oversight of this family," "the [Department] made reasonable efforts to prevent through the recommendations for counseling, online in home services through a [service] provider, and ongoing efforts to engage the mother in the recommended services." The court found the "mother's lack of follow through with recommended services and her decision to defer care of the child to others is the root cause of the removal, not a lack of offered services."

The mother now appeals the modification order. Our review is de novo, Iowa R. App. P. 6.907; *In re K.B.*, 753 N.W.2d 14, 14 (Iowa 2008), and, as always, our primary concern in guiding our decisions is the best interests of the child. *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001). Modification of a dispositional order is provided for in Iowa Code section 232.103 (2015), and the party seeking modification must show the circumstances have so materially and substantially changed the best interests of the child require such a change. *In re D.G.*, 704 N.W.2d 454, 458 (Iowa Ct. App. 2008).

## II. *Discussion.*

Iowa Code chapter 232 is to be "liberally construed to the end that each child under the jurisdiction of the court shall receive, preferably in the child's own home, the care, guidance and control that will best serve the child's welfare and the best interest of the state." Iowa Code § 232.1. There is a rebuttable presumption that the child's best interests are served by parental custody, *In re R.F.*, 471 N.W.2d 821, 824 (Iowa 1991), and whenever possible, "the court

should permit the child to remain at home with the child's parent, guardian, or custodian." Iowa Code § 232.102(5)(a). Nevertheless, custody may be transferred by the juvenile court if it finds by clear and convincing evidence that "(1) The child cannot be protected from physical abuse without transfer of custody; or (2) The child cannot be protected from some harm which would justify the adjudication of the child as a [CINA] and an adequate placement is available." *Id.* Further, the court "must make a determination that continuation of the child in the child's home would be contrary to the welfare of the child, and identify the reasonable efforts that have been made." *Id.* § 232.102(5)(b).

The mother does not challenge the juvenile court's determination that modification was in order. Rather, she takes issue with the court's decision to transfer custody to the Department for placement of the child in the care of the Family, maintaining the Family interfered with her relationship with her child. She requests the child be moved to a new foster family, against the child's wishes. She also asserts the court erred in finding the Department provided reasonable services "to maintain [the child] in the mother's care and custody." The State argues the placement determination is for the Department and therefore, the mother lacks standing to challenge the placement. It also asserts that because the mother does not dispute modification was necessary, her reasonable efforts argument is not relevant, and in any event, not preserved for appellate review. We address their claims in turn.

### A. Reasonable Efforts.

We first address the mother's argument that the Department failed to provide reasonable services to avoid an out-ofhhome placement. The mother

states the "record is replete [with] evidence of the substandard services and assistance provided to this family." The mother does not point to any services she requested that the court did not order provided to her or any other lack of reasonable efforts, other than when the Department stopped visitation between the mother and child for over a month, based upon the child's request. However, this was immediately remedied by the court when it learned visitation had been stopped. As asserted by the State, it appears her lack-of-reasonable-efforts argument was not preserved for our review. *See In re S.R.*, 600 N.W.2d 63, 65 (Iowa Ct. App. 1999) (finding a parent's failure to demand other or additional services was insufficient to preserve the issue for appellate review); *In re M.B.*, 595 N.W.2d 815, 818 (Iowa Ct. App. 1999) (noting a parent had the responsibility to challenge or object to services).

Still, even if we assume without deciding the Department did not provide adequate services to the mother, it is unclear how the relief the mother seeks here—the removal of the child from the Family to placement with an unknown foster family—is relevant to her lack-of-reasonable-efforts argument. In any event, the subsequent proceedings in the juvenile court have rendered this argument moot. *See In re A.M.H.*, 516 N.W.2d 867, 871 (Iowa 1994) ("Any error committed in granting the temporary ex parte order cannot now be remedied. We cannot go back in time and restore custody based on alleged errors in the initial removal order."). Furthermore, the mother still has the opportunity to address her own mental health needs and request of the court any services she needs, as well as develop and demonstrate her ability and commitment to caring for her child. We affirm on this issue.

### *B. Interference by the Family.*

The mother asserts the Family interfered with her relationship with the child and requests the child be placed with a new, unknown foster family. This court has noted research has shown:

> Multiple foster placements are detrimental to a child, may result in shallow indiscriminate emotional relationships in later years, and may become the source of antisocial, delinquent or criminal behavior. Children who have formed emotional ties to a foster family suffer the same emotional effect upon removal as do children being moved from the biological home. Each time a child is separated attachments may be broken generating insecurity and an inability to form future attachments. The inability to form attachments may permanently impair a child's ability to form loving relationships.

*In re C.S.*, 423 N.W.2d 567, 568-69 (Iowa Ct. App. 1988) (internal citations omitted). Regardless, our de novo review of the record reveals that the Family is not the issue.

Here, the involvement of the mother and child with the Department and juvenile court did not arise out of nothing. Rather, the Department has had pretty constant allegations of abuse concerning this child since 2007. More importantly, the child herself told the court that the mother hit her in the past and she was afraid. This appears to be a large part of the cause of the breakdown in the relationship between the child and the mother. That the child did not speak up before now is not unusual, given her age and her relationship with the mother.

Moreover, the mother has had directions from the court for this child to receive therapy for almost as long as the Department has been involved with the mother and child. Their relationship might have been able to be addressed in therapy sooner had the mother followed the directions, but she did not. The

mother asserts this was not her fault, but in the mother's mind, very little is her fault. The mother's actions and inability to take responsibility for the consequences of her actions have clearly contributed to the breakdown of the parent-child relationship.

Finally, the mother blames the Family for the child's determination she no longer wants to have a relationship with her mother. Yet, the Family did not even know this child until 2011, and the mother and child's relationship was clearly rocky well before that time. Then, the mother made the choice to leave the child with the Family more and more over time until the child felt abandoned by her mother. The Family has gone above and beyond its call to duty to assure the child's safety and happiness, and the child's desire to stay with them is not material based—this eleven-year-old child is happy to have a bed time, to be able to do her homework, to have people upon whom she can depend, and to be safe. Neither of the Department's case workers or the child's GAL believed that the Family had interfered with the mother's relationship with the child, and clearly the juvenile court found them to be credible.

There is no question some matters in this case have been neglected and handled poorly, and the Department, the service provider, the GAL, and the juvenile court all seem to recognize this. Nevertheless, we agree with the court that it is the mother's choices and lack of follow through that have resulted in the deterioration of the parent-child relationship. What has happened has happened and cannot be undone. Despite the mother's wishes, our concern is the best interests of the child, and the evidence plainly shows that placing the child now with a foster family she does not know is not in the child's best interests. With

the mother's permission, and sometimes at her request, the child began spending more and more time with the Family. This child has developed a close bond with the Family. The bond should not now be broken simply because the mother has had a change of heart. The child's own statements evidence that she is afraid to return to her mother's care and that removing the child from the Family's care at the present time is not in the child's best interests. We therefore agree with the juvenile court's placement of the child with the Department for placement with the Family, with the continuation of services to the mother and child for purposes of reunification. We encourage the mother to follow the directions of the service providers, therapists, and court in working to repair her relationship with her child, and we note that a "parent's failure to address his or her role in the abuse may hurt the parents' chances of regaining custody and care of their children." *In re C.H.*, 652 N.W.2d 144, 150 (Iowa 2002). The mother must work now at putting the child's interests before her own to assure this child has the safety, stability, and security she needs to thrive.

## *IV. Conclusion.*

For all of the above reasons, we affirm the juvenile court's modification of the dispositional order.

**AFFIRMED.**