# IN THE COURT OF APPEALS OF IOWA

No. 25-1233
Filed October 29, 2025

IN THE INTEREST OF L.T., L.T., and B.T.,
Minor Children,

J.T., Mother,
　　　Appellant,

B.T., Child,
　　　Appellant.

_____

Appeal from the Iowa District Court for Clay County, Andrew Smith, Judge.

A mother and child separately appeal the termination of the mother's parental rights. **AFFIRMED ON BOTH APPEALS.**

Tyler J. Alger of Sandy Law Firm, P.C., Spirit Lake, for appellant mother.

Elizabeth K. Elsten, Spirit Lake, attorney for appellant minor child B.T.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Debra S. De Jong of De Jong Law Firm, P.C., Orange City, attorney for minor child L.T. and guardian ad litem for minor children L.T., L.T., and B.T.

Lisa K. Mazurek, Cherokee, attorney and guardian ad litem for minor child L.T.

Considered without oral argument by Schumacher, P.J., and Badding and Langholz, JJ. Sandy, J., takes no part.

**LANGHOLZ, Judge.**

Three children were removed from their mother's custody in November 2022 over concerns about the mother's illegal substance use, mental-health status, and inability to provide care and supervision for the children.[1]  But this was not the first time the children were removed from their mother's custody.  It was the fourth time the oldest child had been removed and the third time the younger two had been removed from the mother's custody through child-in-need-of-assistance ("CINA") proceedings.  The last CINA proceedings had just closed in August 2022.  By the time of the July 2024 termination-and-permanency-review hearing, the mother had made much progress, and the juvenile court declined to terminate her parental rights and instead granted her six more months to work towards reunification.[2]

The Iowa Department of Health and Human Services ("HHS") started an extended trial home visit, which allowed the mother to care for all three children full-time.  But it did not go well.  The mother had difficulty attending to the children's unique mental-health needs, and the trial visit ended with the middle child going to the hospital and the other two returning to their maternal grandparents.  As a result, the State again petitioned for termination of the mother's parental rights.  And after the June 2025 termination hearing, the juvenile court terminated the mother's rights to all three children.  The mother and the oldest child appeal.

---

[1] We avoid using the parties' names to respect their privacy because this opinion—unlike the juvenile court's orders—is public.  *Compare* Iowa Code § 232.147(2) (2024), *with id.* §§ 602.4301(2), 602.5110; *see also* Iowa Ct. R. 21.25.

[2] The juvenile court did terminate the parental rights of each of children's fathers.

On our de novo review, we agree with the juvenile court. The oldest child was not deprived of due process or the effective assistance of counsel at the June 2025 termination hearing. The State proved a statutory ground for termination under Iowa Code section 232.116(1)(f) as to the oldest child because he could not be safely returned to the mother's custody at the time of the termination hearing. And we decline to apply any permissive statutory exception to forgo termination of the mother's rights to the oldest child. As for the mother's appeal, termination is in the children's best interests because, although the children share strong bonds with the mother, she cannot provide the care and stability that each child requires. We thus affirm on both appeals.

## I.      Background Facts and Proceedings

Back in April 2013, HHS[3] became involved with the mother and oldest child when the mother was arrested during a traffic stop for possessing marijuana and drug paraphernalia while the child was in the back seat of her vehicle. That incident led to the removal of the child from the mother's custody and his adjudication as a child in need of assistance. While that CINA case was open, the mother completed a chemical-dependency evaluation, which recommended she complete intensive outpatient treatment. She also became pregnant with her second child and expressed feeling overwhelmed with all that was expected of her. But she regularly attended outpatient treatment and participated in additional services offered to her. Removal of the child was short-lived, and he was returned

---

[3] Before 2022, HHS was known as the Iowa Department of Human Services. But we consistently use its current name in this opinion.

to the mother in September. Then the mother gave birth to her second child in November. And that CINA case closed in October 2014.

But by 2017, the family once again came to the attention of HHS. By that time, the mother had given birth to her third child about twenty months before. And HHS received reports that the mother's third child was wandering around outdoors alone and trying to cross a busy street. About a week later, the youngest was once again found alone wandering around outdoors. The following month, the mother called police to report she had been domestically abused by her paramour. Then the youngest child was found running around outside unclothed while the mother slept. The maternal grandfather reported to HHS that the mother suffered from bipolar disorder and had previously been hospitalized for mental-health issues.

Still, HHS closed its investigation, and the mother took the children to Las Vegas, Nevada. Las Vegas police found the family at a gas station after responding to reports of the children walking barefoot on the hot concrete around the gas station on a 108-degree July day; the children were dirty and had skin rashes. The mother told the responding officers that she only had ninety-seven cents and could not say what or when the children had last eaten, and she only had a tent for the family to stay in. She talked to herself about her struggles, needing more of the oldest child's medication, and the Free Masons. She told the officers that she had a history of bipolar disorder, schizophrenia, depression, anxiety, and attention deficit hyperactivity disorder. And so, the children were removed from the mother's custody by a Nevada court. The mother was admitted to a mental-health facility, and the children were returned to Iowa and placed in the

custody of their maternal grandparents. In September, an Iowa court adjudicated the children as in need of assistance.

The mother returned to Iowa and completed an assessment, which recommended she complete intensive outpatient treatment, obtain a mental-health evaluation, abstain from mood-altering substances, and secure a sober support system. For a while, the mother lived a "nomadic lifestyle," staying with friends, at shelters, and in a hotel. She suffered suicidal thoughts and stayed in a hospital for five days. From there, the mother entered a residential treatment program—where she was diagnosed with depression and bipolar disorder—and successfully completed the program after two months. She then started intensive outpatient treatment and therapy, and she was medication compliant. The juvenile court gave her six more months to demonstrate her ability to maintain sobriety and mental-health stability. At the end of that period, the court found that the mother had made sufficient progress and maintained enough stability that the children could be returned to her. It closed the CINA cases a few months later in January 2019.

The family was back on HHS's radar in late 2019 over concerns about the mother's mental health and substance use. Then, after reports that the mother was leaving the children home alone[4] or in the care of a person not approved to supervise the children and the execution of a search warrant on the family's home revealed three bags of methamphetamine and some marijuana, the children were again removed. They were placed with their maternal grandparents once again before moving to family foster care. And the juvenile court once again adjudicated

---

[4] The children were nine, six, and four years old at the time.

them as in need of assistance. The mother struggled with substance use and her mental health. She was arrested at a gas station for public intoxication and disorderly conduct. And about two weeks later, the mother was involuntarily committed and then released with instructions to attend outpatient treatment.

Instead, the mother committed a series of criminal offenses. She physically assaulted her parents in their home. She drove her car into a ditch and broke into the home of an older couple as they slept. She requested a ride from them and then "keyed" their vehicles when they refused. So she was arrested and taken to jail. The day after her release, her house caught fire and was declared a total loss.

The district court issued a mental-health commitment order for the mother, and she entered a treatment facility for two months. She was diagnosed with "bipolar 1 disorder, most recent episode manic, severe with psychotic features, substance induced mood disorder, cluster B personality traits, attention deficit hyperactivity disorder, combined presentation methamphetamine use disorder and cannabis use disorder." Following her discharge, the mother was engaged in her treatment program, attending her appointments, and medication compliant.

By February 2022, the mother was doing well, had a job and an apartment, and was clean and sober, prompting a trial home visit for the children. And given the mother's progress, that case ended in August 2022.

Unfortunately, that progress was short-lived. In October, HHS received reports that the mother was no longer taking her medications and was behaving in an erratic and unsafe manner around the children. HHS also received word that the mother had marijuana and a methamphetamine pipe in her home and accessible to the children. The mother agreed to a safety plan placing the children

with the maternal grandparents. When a caseworker spoke with the children, they told the worker that their mother had taken the youngest child's "money box" for her drugs. The mother was admitted to the behavioral-health unit of a nearby hospital and agreed that her actions were harmful to the children. Drug testing completed by the hospital came back positive for amphetamines, methamphetamine, and THC. Following the mother's release from the hospital, she was arrested for possession of a controlled substance and then released.

A few weeks later, an HHS worker was contacted by multiple people about the mother's behavior with concerns that she was using methamphetamine. That same day, police found the mother in a store parking lot arguing with someone. The mother also visited the police department, the sheriff's office, and the county attorney's office that day and behaved erratically during those visits. So in mid-November, the juvenile court once again removed the children from the mother's custody. And the court again adjudicated the children as in need of assistance.

Initially, the mother made little progress. She was arrested in February 2023 for assault after she showed up at the home of a stranger and asked to use the bathroom. The stranger denied her request and told the mother to leave the property. The mother responded by pushing her way into the home. Following her arrest, and as she was processed into the local jail, an officer found drug paraphernalia on her person. And while housed at the jail, she assaulted a police officer by punching the officer in the head, grabbing the officer's hair, and biting the officer on the hand. Soon after, the mother entered a mental-health facility.

By June, the mother had moved into her own duplex and was having supervised video visits with the children. Those visits transitioned into in-person

visits midway through the month.  But the mother felt overwhelmed during the visits and had difficulty relating to the children.  She also suffered increased depression symptoms and panic attacks.  And so, she checked into an in-patient program.

The mother improved.  So visits with the children became semi-supervised in March 2024.  And the mother's mental-health provider reported that the mother was doing well with attendance at therapy and medication management.  Still, the State petitioned for termination of the mother's parental rights in April.  At the July termination hearing, the juvenile court was impressed by the mother's progress—as was the children's guardian at litem ("GAL").  In its written ruling the next month, the juvenile court decided that termination would not be in the children's best interests and granted the mother six more months to work towards reunification.

Consistent with that ruling, HHS started an extended trial home visit for the children to live with the mother so she could provide for their care.  But the mother felt overwhelmed with all three children in her care to the point that she didn't know what to do.  And she minimized the children's behavioral problems and emotional challenges during that time.  She did not contact the middle child's therapist when the child was struggling despite direction from an HHS worker to do so.  While the youngest child was at the YMCA, he threatened to kill himself.  The mother simply picked him up and did not contact a mental-health professional.  Another time when the youngest was acting out, the mother could not coax him into her car, so she called the police.  The middle child also acted out against the other two children.  The middle child shoved the youngest down the stairs, and the youngest would sometimes barricade himself in his room for protection.  Another time, the middle child chased the oldest child while wielding a knife when the mother was at work.

The oldest contacted the mother, but she did nothing. The trial home visit ended with the middle child's admission to the hospital for mental-health services and the other two children returning to the maternal grandparents' home.

So in December, the State again petitioned for termination of the mother's parental rights. In April 2025, the attorney and GAL for the oldest child moved to bifurcate the attorney and GAL roles. The juvenile court granted the motion the next day. And the oldest child's newly appointed attorney then filed a motion to continue the termination hearing, citing the attorney's recent appointment and numerous steps the child wanted the attorney to take. The juvenile court granted the motion and moved the termination hearing from May 9 to June 20.

At the June termination hearing, both the middle child and oldest child expressed their desire to return to the mother's custody or for her to have more time to work towards reunification. The mother expressed her desire to have all the children returned to her or more time to work towards reunification. But this time the juvenile court disagreed. The court found that the State proved a ground for termination under Iowa Code section 232.116(1)(f), reasoning:

> The history of this case, the issues with the trial home visit, and the lack of any demonstrable improvement in being able to address the children's needs and behaviors supports the conclusion that the children cannot be returned to [the mother]'s care at this time. Even with the improvement since the end of the trial home visit, [the record] reflects the [Family-Centered Services] provider's considerable concerns regarding [the mother]'s ability to follow through with recommendations and appropriately parent the children.
> Not only would a return of the children to her care likely be short-lived and cause further trauma to the children in the event of yet another removal, but it would pose a risk to [the mother]'s own mental health. Reports of the lack of supervision and other issues during the trial home visit support the inference that [the mother]'s own mental health was suffering from being overwhelmed by the visit

and the requirements associated with it. Nothing occurring since that time would support a conclusion that the children could be returned to her care at this time.

The calculus does not change if the Court considers just returning one child to her care. The most obvious choice is [the oldest child] because of his age. However, any argument that he may be safely returned to [the mother]'s care is not based upon her ability to provide a safe and appropriate home without being overwhelmed, but that he is old enough to self-protect. That argument loses strength when considering that the evidence presented supports the conclusion that [the oldest child] was placed at risk during the trial home visit and did not reach out to any supports in order to ensure his own safety.

As for best interests, the court found:

The most important factors which led to the granting of additional time have changed since the first Termination Hearing. The grandparents are willing to be a long-term placement for [the oldest and youngest children]. As such, [those children] are unlikely to be moved from their care. The grandparents are willing to consider placement of [the middle child] once the therapists indicate he could be placed with his siblings. Additionally, the significant progress between the Permanency Hearing and first Termination Hearing has not been duplicated since the end of the trial home visit.

[The mother] acknowledged that some of the incidents which occurred during the trial home visit resulted in trauma to the children. She also agrees that the ending of the trial home visit resulted in additional trauma to the children. At the time of the prior Termination Hearing, she testified that she did not want to cause further trauma by having the children returned to her care only to be removed again. She effectively testified that she would not put them at risk of further trauma if a return to her care did not work out. Despite that earlier testimony, she is asking again for the children to be returned to her care or at least that she be given another six months on top of the prior thirty [months] to work toward reunification. The circumstances of the trial home visit and the lack of follow-through by [the mother], especially as it relates to mental health needs for the children, reflect the serious safety concerns that remain present in this case despite those thirty months of services. While some progress has been made since the end of the trial home visit, that progress has not been sufficient to support the conclusion that another trial home visit would be more successful or that six more months would eliminate the need for removal.

And the court declined to apply any permissive exceptions to termination. So the juvenile court terminated the mother's parental rights to all three children.

Both the mother and the oldest child appeal that termination order. The oldest child argues that (1) he was denied effective assistance of counsel and due process because of the delay in the appointment of counsel separate from his guardian ad litem; (2) the State failed to prove a statutory ground for termination; and (3) the juvenile court should have applied one of the permissive statutory exceptions to termination. And the mother argues only that termination is not in the children's best interests. The State and the GAL both defend the order.

## II.     Due Process and Ineffective Assistance of Counsel

We first address the oldest child's claims that he received ineffective assistance of counsel and was deprived of his constitutional due-process rights. To prove an ineffective-assistance-of-counsel claim in a termination-of-parental-rights case, a party must show that "(1) counsel's performance was deficient, and (2) actual prejudice resulted." *In re L.M.*, 654 N.W.2d 502, 506 (Iowa 2002) (cleaned up). We review the claim de novo. *See id.*

The oldest child does not challenge the performance of the attorney who represented him at the termination trial and in this appeal. Instead, he claims that his joint attorney and GAL was ineffective for failing to advocate for his wishes of reunifying with the mother rather than termination. He essentially contends that the GAL should have moved to bifurcate the two roles sooner. *See* Iowa Code § 232.89(2), (4); *In re A.T.*, 744 N.W.2d 657, 660–66 (Iowa Ct. App. 2007) (reversing juvenile court's denial of motion for counsel separate from GAL for mature twelve-year-old who disagreed with GAL's position on termination).

But even assuming that the child's joint attorney and GAL provided ineffective assistance before the bifurcation of the two roles, the oldest child cannot establish that "the result of the termination of parental rights proceedings would likely have been different." *In re T.P.*, 757 N.W.2d 267, 275 (Iowa Ct. App. 2008). The child complains that he did not have a separate attorney at earlier hearings, but he cannot explain how that would have resulted in a different outcome at the second termination hearing. He argues that he had little time to "file motions for reasonable efforts, to hold staffings or solution focused meetings, meetings with counsel for the mother and potentially other children" by the time separate counsel was appointed. But we see no basis to conclude that any additional time could have affected the outcome of the second termination hearing. The juvenile court's decision to terminate was rooted in the mother's continued mental instability despite receiving a variety of services for several years. There is no reasonable probability—indeed, it is highly unlikely—that the court would have reached a different result had the child been represented by separate counsel earlier in the life of the case. Because the oldest child cannot establish actual prejudice, his ineffective-assistance claim fails.

The oldest child also contends that his due-process rights were violated because he was "not given notice and opportunity to be heard." But he never raised this issue before the juvenile court, so it is not preserved for our review. *In re K.C.*, 660 N.W.2d 29, 38 (Iowa 2003) ("Even issues implicating constitutional rights must be presented to and ruled upon by the district court in order to preserve error for appeal."). And error preservations issues aside, the child's argument has no merit. He had notice of the termination hearing. Indeed, his attorney

successfully postponed the termination hearing for more than a month. Both the child and his attorney appeared at the termination hearing. The child testified. The attorney questioned witnesses on his behalf and had the opportunity to call witnesses, offer evidence, and present a written closing argument. The child was given notice and the opportunity to be heard.

### III. Grounds for Termination

Terminating parental rights under Iowa Code chapter 232 follows a three-step process. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). First, the State must prove a statutory ground for termination. *Id.* Second, the State must show termination is in the best interests of the children. *Id.* And finally, the parent bears the burden to show whether a discretionary exception applies that should preclude termination. *Id.* We review a termination decision de novo, giving "respectful consideration" to the juvenile court's factual findings, especially when based on credibility determinations. *In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021).

The juvenile court terminated the mother's parental rights under Iowa Code section 232.116(1)(f) as to all three children. The mother does not challenge the court's determination that all four elements of section 232.116(1)(f) are met. But the oldest child does as it relates to the termination of her rights to him.[5] Under section 232.116(1)(f), the State must establish that (1) the child is four years old or older, (2) the child has been adjudicated CINA, (3) "[t]he child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at

---

[5] The child has standing to challenge the grounds for termination of his mother's parental rights to him. *See In re S.O.*, 967 N.W.2d 198, 207 (Iowa Ct. App. 2021).

home has been less than thirty days," and (4) the child cannot be safely returned to the parent's custody at the time of the termination hearing. *See In re A.S.*, 906 N.W.2d 467, 473 (Iowa 2018) (interpreting the statutory phrase "at the present time" to mean at the time of the termination hearing). The oldest child limits his challenge to the third and fourth elements.

As to the third element, the oldest child points out that the trial home visit lasted about sixty days, so he contends the third element is not satisfied because the "trial period at home" was more than thirty days. *See* Iowa Code § 232.116(1)(f)(3). He misinterprets the phrasing of the element. The limitation that any "trial period at home" cannot be longer than thirty days only applies when the child has been removed from parental custody for the last twelve consecutive months. The durational element of the statutory ground can also be satisfied when "[t]he child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months." *Id.* Given the timeline of this case, this element is easily satisfied.

As to the fourth element, we agree with the juvenile court that the child could not be safely returned to the mother's custody at the time of the termination hearing. The child points to his testimony as well as his mother's that he could return to her custody and the fact that he is older and has a greater protective capacity than a younger child. But the overwhelming evidence presented at the termination hearing belies his claims. Time and time again, the mother has reached periods of apparent stability only for it all to fall apart. Even the simplest everyday task can be overwhelming for her. For example, she testified that it is "very emotionally overwhelming" for her to sort through spam in her email even

though she knew she would receive notices about staffing appointments for one of her children through email.

When the children were in her care during the trial home visit, the mother would defer to a child's wants rather than the child's needs, like when she did not contact one of the children's therapists as the child's mental health deteriorated because the child did not want to be medicated. That child ended up hospitalized as a result. And while that incident did not involve this child, it is indicative of the mother's inability to act in a child's best interests. And unfortunately, we cannot rely on the child's own protective capacities to keep him safe given the fact that he did not reach out to services when things started to go south during the trial home visit. To be clear, the onus of establishing and maintaining a safe environment was solely on the mother, and she failed to do that. We believe that she would fail again if given the opportunity, and the child would try to hide that danger out of love and loyalty to this mother. As a result, the child cannot be safely returned to the mother's custody.

## IV.     Best Interests of the Children

Only the mother challenges whether termination of the mother's parental rights is in the children's best interests. She points to her bonds with the children, highlighting that the middle child feels safe confiding in her and the oldest child is close enough with the mother that he can spot the warning signs when she is about to go into a manic state.

The best interests of the children are the "paramount concern in a termination proceeding." *L.B.*, 970 N.W.2d at 313. We consider both the children's long-range and immediate best interests. *See In re C.K.*, 558 N.W.2d 170, 172

(Iowa 1997). And we must give "primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Iowa Code § 232.116(2); *see also In re M.W.*, 876 N.W.2d 212, 224 (Iowa 2016). As to the mother's bonds with the children, we consider them to the extent that their severance would impact the children's mental and emotional condition and needs. *See In re L.A.*, 20 N.W.3d 529, 535 (Iowa Ct. App. 2025) (en banc).

To be sure, the children are strongly bonded to the mother. But the mother does not use those bonds to the children's benefit. She notes that the middle child confides in her due to their close bond. But that means little when the mother does not react to those confidences in a protective capacity. Again, she knew the child's mental health was deteriorating, yet she did not contact the child's therapist. We commend the middle child for making so much behavioral and mental-health progress as of late. This is wonderful news. But the child only made that progress once away from the mother and in residential care, which likely would not have happened in the mother's custody. The mother admitted at the termination hearing that she did not provide the children with the permanency and stability that they require during the trial home visit and that the visit traumatized the children. After more than a decade of cycling through progress and regression without becoming capable of consistent, safe parenting, we see no reason to believe that the mother would be able to permanently improve upon her parenting from the trial home visit.

The oldest child might be the most bonded to the mother, but their bond is not healthy. Both mother and child look to the oldest child to help keep the mother's

mental health on track. That is not a role to thrust upon a child—even a teenager. A parent's role is to care for and protect their child, not the inverse. *See In re B.T.*, No. 25-0265, 2025 WL 1325277, at *4 (Iowa Ct. App. May 7, 2025) ("[P]rioritizing the 'crucial days of childhood' means ensuring that children are the ones being cared *for*." (quoting *In re A.C.*, 415 N.W.2d 609, 613 (Iowa 1987))); *In re J.D.*, No. 11-1122, 2011 WL 4578486, at *3 (Iowa Ct. App. Oct. 5, 2011) ("A child's long-term nurturing and growth is not furthered when the child becomes responsible for nurturing the parent.").

Bottom line, we agree with the juvenile court that it is in the children's best interests to terminate the mother's parental rights.

## V. Permissive Statutory Exceptions

Finally, the oldest child relies on potential permissive statutory exceptions to termination as reasons why we should reverse the juvenile court. It is the burden of the party resisting termination to prove that an exception should be applied. *See A.S.*, 906 N.W.2d at 475–76. The child points out that the children were in the care of relatives, seemingly implicating section 232.116(3)(a). That exception permits the court to forgo termination when "[a] relative has legal custody of the child." Iowa Code § 232.116(3)(a). But here, the oldest child was in the legal custody of HHS and only placed in the physical care of the maternal grandparents, so section 232.116(3)(a) does not apply. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014).

The child also points to section 232.116(3)(b), which permits the court to forgo termination if the child is over the age of ten and objects to termination, and section 232.116(3)(c), which permits the court to forgo termination when "[t]here is

clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." We understand that the oldest child seeks to apply these permissive exceptions because he loves his mother greatly and wants to help care for her. His motives are honorable and understandable. But we cannot go along with his request. The mother has shown through her conduct over the last decade that she cannot be trusted to safely parent the child. The child cannot fully appreciate the danger the mother poses because it has been ever present almost his entire life. We thus decline to apply either permissive exception to preserve the legal bond between the mother and child.

**AFFIRMED ON BOTH APPEALS.**