# IN THE COURT OF APPEALS OF IOWA

———————————

No. 26-0657
Filed June 24, 2026

———————————

**In the Interest of N.W., Minor Child,**

**K.W., Mother,**
Appellant.

———————————

Appeal from the Iowa District Court for Black Hawk County,
The Honorable Michelle Jungers, Judge.

———————————

**AFFIRMED**

———————————

Andrew C. Abbott of Abbott Law Office, P.C., Waterloo, attorney for
appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney
General, attorneys for appellee State.

Rachel Antonuccio of the Juvenile Public Defender's Office, Waterloo,
attorney and guardian ad litem for minor child.

———————————

Considered without oral argument
by Schumacher, P.J., and Ahlers and Badding, JJ.
Opinion by Badding, J.

**BADDING, Judge.**

A mother who was abused and abandoned when she was a child appeals the termination of her parental rights to her two-year-old daughter, N.M.[1] Because of the trauma she suffered in her own childhood, the mother has understandably struggled with her mental health for years. She also has an intellectual disability that impacts her ability to safely care for the child.

Despite these difficulties, the child's guardian ad litem told the juvenile court that the mother was a kind and loving parent who shared a strong bond with her daughter. Yet the guardian ad litem recommended termination because "too many safety concerns remain, too much time has passed, and sufficient progress just has not been made and does not appear likely to be made in the next six months." The juvenile court agreed and terminated the mother's parental rights under Iowa Code section 232.116(1)(g) and (h) (2025). We affirm.

## I.    Background Facts and Proceedings

In a mental health evaluation, the mother told a social worker that when she was a child, her mother abandoned her in their apartment. The mother was placed in foster care until her father was located. But her father and stepmother physically and verbally abused her. And at age fourteen, a stranger sexually assaulted her. When she turned eighteen years old, the father kicked the mother out of his home. She was homeless for years after that and in a series of violent and exploitative relationships.

One of those relationships was with the father of her three children. Like the mother, he was the product of a troubled childhood spent partly in

---

[1] The child's father does not appeal the termination of his parental rights.

the foster care system. He struggled with substance use and had several mental health diagnoses. The father also had a criminal history that included a domestic abuse assault conviction with the mother as the victim.

The mother gave birth to her first child in 2020 while she and the father were living in Florida. They moved to Iowa to avoid Florida's child protection services, which became involved with the family because of concerns about the child's unmet medical needs and domestic violence between the parents. The mother's second child was born in mid-2022. The Iowa Department of Health and Human Services intervened in December after the infant was admitted to the hospital for failure to thrive. The five-month-old girl also had a severe diaper rash that required care at a wound clinic. She was removed from the parents' custody when both problems persisted despite support from the department. Six months later—in June 2023—the older child was found wandering in the street wearing only a soiled diaper and t-shirt. He was also removed from the parents' custody.

Meanwhile, the mother became pregnant with her third child, N.M. She gave birth to the child in early 2024, while her two older children's cases were still open.[2] With the support of the department, N.M. remained in the mother's custody until February 2025, when the mother had a mental health crisis. The child was removed and placed with the foster family who was caring for the oldest child. The foster parents discovered that, like her sister before her, N.M. had a severe, untreated diaper rash. And the department learned that in January, the mother had been assaulted by her boyfriend while N.M. was present. Adding to the chaos, the father had been released from prison and was trying to contact the mother despite a no-contact order.

---

[2] The mother's parental rights to those children were eventually terminated.

The child was adjudicated in need of the court's assistance in March 2025. Over the next few months, the mother stopped participating in counseling. She was also allowing the father into her home and meeting with men she met online who had substance use issues. Although she had stable housing, the mother struggled to keep it clean. Additionally, she was without reliable transportation and unemployed, although she was trying to apply for Social Security disability benefits. The mother was also inattentive to N.M.'s diaper rash, interfered with some of her medical care, and was unaware of common choking hazards—despite years of parenting education. When service providers tried to provide parenting prompts at visits, the mother would yell and swear at them. In July, the mother was briefly hospitalized for her mental health after making suicidal statements and reporting that she was experiencing hallucinations from her medications.

In an August update to the juvenile court, the department stated that even "[w]ith a multitude of services being offered and support" from professionals, "matters still continue to be concerning with very little improvement." The little improvement the mother had made eroded in September when she moved into a friend's home about forty minutes away. The mother left her home because she was having problems with a woman that she had let stay with her. While the mother was living with her friend, she began canceling appointments with the case manager from the department and missing her visits with N.M. She also canceled appointments with her therapist and parenting partner.

By the permanency hearing in November, the department recommended proceeding to termination. The case manager noted that while it was "very clear" that the mother loves N.M, "there have been many concerns regarding [her] ability to be a safe and stable caregiver." Although

service providers had provided "intense oversight," the mother "has still struggled and there have been growing concerns regarding [her] overall stability." The case manager explained that while N.M. was "just a few months shy of turning 2 years old," the department "has been working with the family since December of 2022. That is nearly 3 years of services. Despite this lengthy period of time of services being offered, concerns still remain." The child's guardian ad litem agreed, writing:

> This is in no way to discourage [the mother's] continued efforts to move forward. I like [her] very much. She has had an extremely difficult life with virtually no support from any of the many people whom she reasonably expected to stand up for her. But [N.M.] has now been out of [the mother's] care for 9 months, and I cannot point to any significant progress or increase in stability. To that end, I believe the question of whether termination is appropriate should be assessed by the court.

At the juvenile court's direction, the State petitioned to terminate the mother's parental rights after the permanency hearing. Unfortunately, the mother's instability persisted. The department reported to the court that in December, just hours after the case manager visited the mother's new home, the mother got into an argument with her friend's boyfriend and was kicked out. Fortunately, she still had her lease at her other home. But the mother had let a couple move into the home while she was gone. The condition of the home had deteriorated, especially in the basement where the couple kept a dog that they did not let out. Because of the couple and their dog, the mother's visits could not be held at her home. The mother told the child's guardian ad litem that she wanted the couple to move out but—despite offers of help from service providers—she did not take steps to remove them because she was scared of them.

The department's case manager testified at the termination hearing in February 2026 that N.M. could not be safely returned to the mother's care. She explained:

> [N.M.] has been removed for one year at this time. Visitation remains fully supervised with no progression and we are not near to a point where visits could progress. There are . . . concerns about [the mother's] protective capacity, parenting ability. She's currently in a residence that's deemed unsafe for visits at this time and is not an appropriate setting for [N.M.] to return to. She has struggled with being inconsistent with making herself available for visitation with [N.M.]

The juvenile court agreed, finding that "[d]espite the receipt of more than three years of parenting services, [the mother] is unable to show that she can be a full-time caretaker for [N.M.] now or at any time in the near future." And the court found that termination was in the child's best interest because of her "age, the mother's inability to provide safe care, continued concerns about the mother's mental health and overall instability and the absence of the father." Finally, the court found that no exception to termination applied and denied the mother's request for more time. The mother appeals.

## II.    Analysis

We review termination proceedings de novo. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). Our review follows a familiar three-step framework that considers whether (1) a statutory ground for termination has been established; (2) termination is in the best interest of the child; and (3) a permissive exception should be applied. *In re L.A.*, 20 N.W.3d 529, 532 (Iowa Ct. App. 2025) (en banc); Iowa Code § 232.116(1)–(3). The mother challenges each of these steps and makes a passing request for more time.

## A. Statutory Ground

On the first step, the juvenile court cited two statutory grounds for termination: paragraphs (g) and (h) of Iowa Code section 232.116(1). The first issue heading of the mother's petition on appeal challenges both grounds. But the substance of her argument focuses on her "significant and meaningful contact" with the child, implicating the statutory ground in paragraph (e).[3] Without addressing the merits, the State argues that the mother waived any argument under paragraph (g) and urges us to affirm on that unchallenged ground. *See In re A.S.*, No. 23-1625, 2023 WL 8449568, at *1 (Iowa Ct. App. Dec. 6, 2023) (collecting cases stating that we may affirm on an unchallenged ground).

While the mother does not expressly cite the elements of paragraph (g),[4] she does argue that she was addressing her mental health "before, during, and after the Court's termination order" and that she "has demonstrated an understanding and ability to provide the care and services necessary to care for the child on her own." We generously construe this argument as sufficient to avoid waiver, considering that paragraph (g)

---

[3] Iowa Code section 232.116(1)(e) requires, among other elements, "clear and convincing evidence that the parents have not maintained significant and meaningful contact with the child during the previous six consecutive months and have made no reasonable efforts to resume care of the child despite being given the opportunity to do so."

[4] Those elements are: (1) the child has been adjudicated in need of assistance; (2) the court has terminated parental rights under section 232.117 to another child who is a member of the same family; (3) "the parent continues to lack the ability or willingness to respond to services which would correct the situation"; and (4) "an additional period of rehabilitation would not correct the situation." Iowa Code § 232.116(1)(g).

examines a parent's "ability or willingness to respond to services which would correct the situation."[5]

But we elect to affirm on the other ground challenged by the mother—paragraph (h). *See In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012) ("When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record."). The mother challenges the fourth element, which requires clear and convincing evidence that the child could not be safely returned to her custody "at the present time." Iowa Code § 232.116(1)(h)(4); *In re A.S.*, 906 N.W.2d 467, 473 (Iowa 2018) (interpreting "present time" to mean "the time of the termination hearing"). The mother argues that "[w]ith continuing education and support," and "with services put into place and oversight," the child could be safely returned to her custody. We disagree.

As the mother's argument recognizes, the child could not have been safely returned to her custody at the termination hearing without continuing intervention from the department. *See C.B.*, 611 N.W.2d at 495 (stating that once the statutory time frames have passed, "termination proceedings must be viewed with a sense of urgency"). She admitted as much during her testimony, when she agreed that N.M. could not be returned to her that day because of the people living in her house. Beyond that concern, the mother was still at supervised visits after three years of services aimed at improving her parenting skills. *See In re E.R.-H.*, No. 25-1627, 2026 WL 44660, at *3 (Iowa Ct. App. Jan. 7, 2026) (noting that "a failure to progress past

---

[5] In doing so, we remind the mother's attorney that "[a] broad, all encompassing argument is insufficient to identify error in cases of de novo review." *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). And we remind the State that even when it thinks an argument has been waived, it's helpful to address the merits in case we disagree.

supervised visits prevents custody from being returned" to a parent). The case manager highlighted some of those parenting deficiencies, which included not knowing how to use N.M.'s car seat, failing to change the child's diaper, and not preventing N.M. from running away during visits. The last two are especially concerning given the mother's parenting history with her older children, who suffered because of similar inattentiveness.

These are not the most serious parenting deficiencies we have seen. However, when coupled with the mother's long-standing mental health struggles—which continually led her into unsafe situations like the one preventing the child's return at the termination hearing—we find the juvenile court correctly terminated the mother's parental rights under section 232.116(1)(h).

## B. Best Interest

In an argument that conflates the second and third steps in our analysis, the mother next claims that terminating her parental rights is not in the child's best interest because of their significant bond and the closeness of the parent-child relationship. Although the State only addresses the best-interest question, we again give the mother the benefit of the doubt and consider both issues.[6]

In reviewing the best-interest step, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2); *see also In re P.L.*,

---

[6] We note, however, that "[t]o avoid the risk of waiving an issue, if a party intends to advance both a best-interests and permissive-exception argument, the party needs a separate issue heading and argument for each." *L.A.*, 20 N.W.3d at 534 n.2.

778 N.W.2d 33, 37 (Iowa 2010). Because "[a] child's mental and emotional condition and needs is inherently impacted by the child's bond with a parent," that bond "is a relevant consideration in the best-interests analysis." *L.A.*, 20 N.W.3d at 535. But it is not the only consideration.

The mother is correct that all the professionals involved in this case acknowledged the strong bond between her and N.M. The juvenile court did as well, stating: "It is clear from the reports and from [the mother's] testimony that she loves her daughter deeply, but it is also clear that many of the concerns that existed at the time of the removal remain, despite the receipt of numerous services." We agree.

Although the mother loves N.M. and wants to care for her, the record shows that she is not the best placement for furthering the child's long-term nurturing and growth or providing for her physical, mental, and emotional needs. *See In re A.B.*, 956 N.W.2d 162, 169 (Iowa 2021) (stating that "the existence of a bond is not enough" where the mother "had not really advanced as a parent"). By all accounts, N.M. is thriving with her foster parents and brother. They are adopting N.M.'s brother and intend to adopt her too. *See* Iowa Code § 232.116(2)(b). The foster parents are also committed to maintaining contact with the siblings' middle sister. While we do not doubt the mother's love for her daughter—or their strong bond—we cannot deny this child permanency any longer given the mother's history and stagnation in this case. *See A.B.*, 815 N.W.2d at 778 ("Insight for the determination of the child's long-range best interests can be gleaned from evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing." (cleaned up)).

10

**C. Permissive Exception**

For many of the same reasons, we deny the mother's claim that the juvenile court should not have terminated her parental rights because of her strong bond with the child. *See* Iowa Code § 232.116(3)(c) (permitting the court to avoid termination when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship"). The exceptions "in section 232.116(3) are permissive, not mandatory, and the court may use its discretion, based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship." *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (cleaned up).

In her closing remarks to the juvenile court, the child's guardian ad litem not only recognized the strong bond between the mother and N.M., but she stated that termination would harm N.M. if that bond was severed. Still, the guardian ad litem did not recommend application of the exception because of the mother's lack of progress and corresponding concerns about the child's safety. The juvenile court agreed with that assessment, as do we.

**D. Additional Time**

Woven within the mother's arguments about the three steps in our termination framework, she requests "a deferral of permanency to allow the child to be parented by [her] biological mother." Additional time is appropriate only if we can conclude "the need for removal . . . will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). The mother does not identify any "specific factors, conditions, or expected behavioral changes which [would] comprise the basis" for such a determination. *See id.* And it's "not our role to advocate

what potential circumstances would warrant an extension on the [mother's] behalf." *In re A.H.*, No. 20-1660, 2021 WL 1399743, at *4 (Iowa Ct. App. Apr. 14, 2021).

In any event, we again agree with the guardian ad litem, who told the juvenile court that given the mother's three-year history with the department, providing her with more time would not "give us what we need to ensure [N.M.'s] safety." As our supreme court has recognized, "[t]he crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems." *In re A.C.*, 415 N.W.2d 609, 613 (Iowa 1987). Because we cannot conclude the need for removal will no longer exist after six months, we find additional time is unwarranted.

**AFFIRMED.**